**ALABAMA–TENNESSEE NATURAL GAS CO. v. FEDERAL POWER COMMISSION (two cases).**

Nos. 10766, 10791.

United States Court of Appeals Third Circuit.

Argued Jan. 20, 1953.

Decided April 1, 1953.

Rehearing Denied April 21, 1953.

Stanley M. Morley, Washington, D. C. (Robert E. May, Charles V. Shannon and Wheat, May & Shannon, Washington, D. C., David I. Day, Jr., and Marshall, Batman & Day, Terre Haute, Ind., on the brief), for Alabama-Tennessee Natural Gas Co.

Reuben Goldberg, Washington, D. C. (Bradford Ross, Gen. Counsel, Bernard A. Foster, Jr., Asst. Gen. Counsel, Sherman S. Poland, Albert J. Feigen, Washington, D. C., on the brief), for Federal Power Commission.

Before GOODRICH, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This is the relevant history of the administrative action of the Federal Power Commission which we are asked to review in these cases. The starting point is an order of July 2, 1948, by which the Commission granted Alabama-Tennessee Natural Gas Company, hereinafter designated as the petitioner or the Company, a certificate of public convenience and necessity under Section 7(c) of the Natural Gas Act, 56 Stat. 84 (1942), 15 U.S.C.A. § 717f(c), authorizing it to build and operate certain extensions of a natural gas pipe line system on condition that a tariff satisfactory to the Commission be submitted six months before the beginning of the new operation.

On December 16, 1949, petitioner filed a tariff which it proposed to become effective

about March 1, 1950, on the beginning of its deliveries and to continue fourteen months thereafter. Objections were filed by certain communities which would be served by the new line. By order of February 10, 1950, the Commission rejected the proposed tariff saying that it did "not constitute satisfactory compliance" with the condition of the certificate and further directing that the certification proceedings "be reopened, and further public hearings held with respect to the matters involved in and necessary to the determination of a tariff satisfactory to the Commission". Hearings followed during the course of which conflicting evidence was received and various controversial contentions were advanced.

This reopening of the certification proceeding resulted in an order of June 16, 1950, wherein the Commission decided, in the light of serious and unresolved conflicts in the evidence and interpretation thereof, that it should and would postpone "determination of what constitutes a satisfactory tariff until such time as the uncertainty resulting from the conflicting estimates can be dispelled by data derived from operating and construction experience". To provide such experience the order further authorized the petitioner to begin and for fourteen months to continue operations under the tariff which had been proposed December 16, 1949 and rejected February 10, 1950. However, the order expressly provided that "Nothing contained in this order shall be construed as constituting approval of the Commission of any service, rate, charge * * * provided for in the above-described interim tariff * * *." Finally, this order also provided that thirty days prior to the expiration of the fourteen month period of operation under the interim tariff the petitioner "shall submit a tariff * * * satisfactory to the Commission, together with cost studies and other data in support thereof". All of this was in accordance with the Company's original December 16, 1949 submission, for that filing suggested that an interim tariff be permitted "in accordance with the Commission's decision In the Matter of Texas Eastern Transmission Corp., entered in

Docket No. G-1089 on December 9, 1949", and the restrictive provisions of the June order are like those of the order in the Texas Eastern case.

In November 1950, the Company began operations under this June 16, 1950 order. Thirteen months later, at the end of November 1951, it proposed that the interim tariff now be accepted on an unrestricted basis as a satisfactory tariff. The Commission rejected this proposal and ordered further hearings to determine a satisfactory tariff, meanwhile continuing the interim tariff, first until January 31, 1952 and later until April 30, 1952, pending that determination. The hearings thus ordered began January 14, 1952. The same day the Company filed a schedule of increased rates which it proposed to make effective February 13, 1952 as a change in its tariff to meet certain increased costs. On February 1, 1952, the Commission entered an order rejecting this proposal as presenting issues comprehended by and properly to be decided in the hearings then in progress. This order is one of the matters now before us for review.

During the course of these hearings which began January 14, 1952 the Commission entertained a motion by counsel for its staff that the procedure of intermediate report and recommendation by the hearing officer be omitted in this case. Over petitioner's objection the Commission granted this motion by order issued February 25, 1952. That order is also here for review.

Finally, after completing the hearings, the Commission on May 1, 1952 issued an order deciding that neither the interim tariff nor the rate proposal of January 14, 1952 was satisfactory. Instead the Commission found that a tariff incorporating a "uniform straight rate of 31½¢ per Mcf" was "just, reasonable * * * and satisfactory to the Commission in accordance with the rate condition issued to Alabama-Tennessee Natural Gas Company by order issued July 2, 1948". This is the third order which we have before us for review.

We first consider the order issued February 1, 1952 rejecting the filing by

which petitioner attempted to accomplish a rate increase under the procedure set out in Section 4(d) of the Natural Gas Act, 52 Stat. 823 (1938), 15 U.S.C.A. § 717c(d). Petitioner does not deny that the territorial extension of its services and operations out of which this controversy arises required a certificate of public convenience and necessity under Section 7(c) of the Act. It does not deny that the rate condition originally incorporated in its certificate was within those "reasonable terms and conditions" which Section 7(e) says the Commission may "attach to the issuance of the certificate". 56 Stat. 84 (1942), 15 U.S.C.A. § 717f(e). Nor does it challenge the order of June 16, 1950. And that order, entered after hearings in the reopened certification proceeding, determined, as we already have summarized it, what should be done to arrive at such a satisfactory tariff as was a condition of the certificate itself. Indeed, petitioner could not very well challenge this order since its own December submission had suggested just such a procedure as the Commission sanctioned six months later, including the allowance of an interim rate to afford experiential basis for the postponed determination of a just and reasonable rate satisfactory to the Commission. In its brief, petitioner goes so far as to say that "Respondent's extended discussion of the power of the Commission to attach rate conditions to the certificates which it issues is an effort to obfuscate the real issues in this case". Accordingly, abjuring obfuscation, we treat this as a case where analysis has its agreed and proper starting point in the existence of a valid rate condition in the original certificate and a valid supplementary and modifying order of June 16, 1950 providing for a temporary *modus operandi.*

Thus, our only problem is whether in addition to the Company's right and duty under the June 16, 1950 order to work out and put into effect, as yet for the first time, a satisfactory rate, it also had the privilege, in the midst of this duly prescribed preliminary procedure, to invoke the mechanics of Section 4(d) to accomplish an increase in the charges which the Commission had permitted it to make during the interim period. To treat the "interim rate" permitted under the June 16, 1950 order as the kind of rate which is subject to change on the free initiative of the Company under Section 4(d) is to ignore the restrictive context in which it was allowed to become effective. For it is our premise that the Commission had power to impose the rate condition and it is clear that the June 16, 1950 order was in substance a relaxing modification of that condition in accordance with petitioner's own request. This conjunction of administrative power and the suitor's consent in our judgment effectively fixed the temporary pattern and terms of the operation during a preliminary period while a just and reasonable rate was being determined. Only after such an initial determination of a satisfactory rate in compliance with the June 16, 1950 order, could the Company properly claim that it was operating under the kind of tariff that is subject to change by Section 4(d) procedure.

▮ Petitioner next complains that the order issued February 25, 1952 dispensing with the intermediate recommendation of the hearing officer was arbitrary and a violation of the Administrative Procedure Act. Section 8(a) of that Act permits omission of the intermediate decision procedure in this type of case if "the agency finds upon the record that due and timely execution of its functions imperatively and unavoidably so requires." [1] The Commission made such a finding of necessity. We have examined the record and can not say that the finding was arbitrary. Accordingly,

---

1. "Whenever the agency makes the initial decision without having presided at the reception of the evidence, * * * [the hearing] officers shall first recommend a decision except that in rule making or determining applications for initial licenses (1) in lieu thereof the agency may issue a tentative decision or any of its responsible officers may recommend a decision or (2) any such procedure may be omitted in any case in which the agency finds upon the record that due and timely execution of its functions imperatively and unavoidably so requires." 60 Stat. 242, 5 U.S.C.A. § 1007 (a).

we sustain it. Compare Kenny v. U. S., D.C.N.J. 1952, 103 F.Supp. 971. In this connection we have noted that at the Company's request the June 16, 1950 decision was made without preliminary recommendation of the examiner though there had been extended hearings before him on essentially the same issues as were again before an examiner. We have not been able to discover such difference between the two situations that what was reasonable when the Company requested it in 1950 became arbitrary when the Company opposed it in 1952.

This brings us to the merits of the rate fixing order issued May 1, 1952. The petitioner contends that reversible error appears in the Commission's determination of the rate base. First, it is complained that the Commission erroneously reduced the otherwise allowable working capital figure by deducting certain accruals for payment of federal income taxes. There is no dispute as to the propriety of including a working capital item in the rate base, nor as to what that figure should be, except insofar as the total otherwise arrived at may be affected by consideration of tax accruals.

Federal income tax is included as an item of expense in the computation of the rates which the Company will be permitted to charge during the taxable year. But under Section 56 of the Internal Revenue Code, the Company need not pay its tax until the year following that in which the liability is incurred.[2] Therefore, insofar as customer billings are attributable to the Company's income tax liability, current payments are being received in advance of the time when the Company must pay corresponding obligations. It follows that there is in the hands of the Company at all times a sum which reduces the amount which must otherwise be provided and left in the business in order to enable it to maintain a position liquid enough to meet current obligations. Should this situation be taken into account in determining the amount of working capital to be included in the total capital investment on which petitioner will be allowed a fair return?

"Working capital", in the context of public utility rate regulation, has been defined as the "allowance for the sum which the Company *needs to supply from its own funds* for the purpose of enabling it to meet its current obligations as they arise and to operate economically and efficiently". Barnes, The Economics of Public Utility Regulation (1942) 495. Since it is normally contemplated that all operating expenses will eventually be paid for out of revenues received by the Company, the need for working capital arises largely from the time lag between payment by the Company of its expenses and receipt by the Company of payments for service in respect of which the expenses were incurred. See City of Pittsburgh v. Pennsylvania Public Utilities Comm., 1952, 370 Pa. 305, 309–312, 88 A.2d 59, 61–63. But there are time lags which work in favor of the Company as well as those which work against it. The Company no more pays immediately every liability accrued than do its customers. In determining the need for working capital, the Commission may quite reasonably and properly take into account factors which reduce the need as well as those which increase it.

Petitioner urges that this is the first case in which the Commission has thus considered accumulations of cash which must ultimately be used to pay federal income taxes in computing working capital.[3] How-

2. Under this Section, 26 U.S.C.A. § 56, payments may be made as follows:

| For tax year ending Dec. 31 of the year | Percent of tax due on dates in following year | | | |
|---|---|---|---|---|
| | Mar. 15 | June 15 | Sept. 15 | Dec. 15 |
| 1950 | 30 | 30 | 20 | 20 |
| 1951 | 35 | 35 | 15 | 15 |
| 1952 | 40 | 40 | 10 | 10 |
| 1953 | 45 | 45 | 5 | 5 |
| 1954 and thereafter | 50 | 50 | | |

3. It is to be noted that in cases decided after the instant one the Commission has followed the method of computation adopted here. See Transcontinental Gas

ever that may be and for whatever reason, we do not consider the past practice of the Commission to be decisive, since determinations of public utility rates are based to a large extent on estimates which project into the future and necessarily involve uncertain predictions and many imponderables. A factor which theoretically should enter into such a computation may be ignored in recognition that offsetting factors also are omitted. Or, under given circumstances the overall computation may unavoidably be so imprecise that the omission of a particular small factor is unimportant. In other cases or in changed times, the same factor may loom sufficiently large that it cannot be ignored if the result reached is to be based on an informed rather than an arbitrary estimate. The need for flexibility to accomplish such re-evaluations is one of the considerations that make rate regulation more appropriately an administrative than a judicial function.

Moreover, the approach now taken by the Commission in determining the effect of tax accruals on working capital has been adopted by many state regulatory bodies,[4] and has been approved by economists.[5] While these views are not binding on the Commission or on this court, they represent a body of professional opinion that helps to establish in our contemplation the reasonableness of the Commission's view.

 Petitioner also claims that the Commission erred in the technic it employed in allocation of total costs between jurisdictional customers and nonjurisdictional customers. The allocation itself is necessary in order that the Commission may properly determine what rates jurisdictional customers may be legally charged. The Commission divided all costs on a "volumetric" basis. This means that the proportion of total costs assigned to jurisdictional business equals the volume of gas delivered to jurisdictional customers during the test period divided by the volume of gas delivered to all customers during the same period.

Normally, the Commission divides only operating costs on "volumetric basis" between the two classes of business. Fixed costs normally are allocated on the basis of "peak day" requirements of the two classes. It is the failure of the Commission to allocate fixed costs on some basis other than actual gas delivered throughout the year to which petitioner here objects. Indeed, petitioner alleges that use of the volumetric ratio is so arbitrary and at variance with the facts that in legal contemplation it is no allocation at all and the Commission has failed in its duty to make an allocation.

In most cases, the argument for allocation of fixed costs on the basis of peak day requirements seems to presuppose that peak day demands absorb the full capacity of the system. In that event peak day demands of the jurisdictional customers measure the amount of the system's capacity that

Pipe Line Corp., Opinion No. 227, decided May 28, 1952; Northern Natural Gas Co., Opinion No. 228, decided June 10, 1952; Northern Natural Gas Co., Opinion No. 228–A, decided September 25, 1952; Colorado Interstate Gas Co., Opinion No. 235, decided July 31, 1952; Colorado Interstate Gas Co., Opinion No. 235–A, decided September 26, 1952; Mississippi River Fuel Corp., Opinion No. 234, decided July 29, 1952. Although the Commission had not used a precise figure representing tax accruals in computing working capital in earlier cases, it had recognized the effect of such accruals. See Panhandle Eastern Pipe Line Co., 1942, 3 F.P.C. 273, 283, affirmed, 8 Cir.1944, 143 F.2d 488, affirmed 1945, 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241.

4. See e. g., Pacific Telephone & Telegraph Co., California Public Utilities Commission, 1948, 75 P.U.R.,N.S., 379, 400; Michigan Bell Telephone Co., Michigan Public Service Commission, 1945, 62 P.U.R.,N.S., 77, 81; Long Island Lighting Co., New York Public Service Commission, 1935, 18 P.U.R.,N.S., 65, 159–160. The Supreme Court of Pennsylvania held it error for a regulatory agency not to consider the effect of tax accruals and other lag factors which work in favor of the company in its determination of working capital. City of Pittsburgh v. Pennsylvania Public Utility Commission, 1952, 370 Pa. 305, 88 A.2d 59.

5. See Barnes, The Economics of Public Utility Regulation (1942) 496–99; Foster and Rodey, Public Utility Accounting (1951) 101.

is held ready at all times to serve them, even though their average daily use actually represents a much smaller portion of average total use. It is therefore considered fair to make those customers bear the cost of the facilities thus found to be maintained for their benefit.[6]

But in the instant case, petitioner's business is still in the developmental stage and it is conceded that the peak day demands recorded during the test period fall far short of absorbing the full capacity of the system and thus do not have the significance that they would have in the normal case. Apparently recognizing this difficulty, petitioner offered three alternative methods of computation, each of which sought to give effect to relative demands of, rather than average deliveries to, the two types of customers through the use of figures other than the peak day demand ratio.[7] The Commission rejected all three methods proposed by petitioner and allocated the total fixed costs between the two classes of business on the basis of relative average day usage, apparently reasoning that so long as there remained a large amount of unused capacity even on the test period peak day no allocation based on demand rather than average use would mean very much. Thus, as the matter now stands, the cost of having additional unused facilities available is to be divided between the two classes of customers in accordance with actual use and no weight is to be given to the rather different fraction of system capacity to which each is entitled or can be expected to demand.

It is also noteworthy that in denying petitioner's application for rehearing, the Commission pointed out that one of the chief factors supporting use of demand allocation of fixed costs in the typical case is the value of the priority which wholesale (jurisdictional) customers enjoy over industrial (nonjurisdictional) customers, when the system is utilized to capacity. But the Commission found this priority presently insignificant in this case because in the current stage of development there is much more than ample capacity to meet all needs of all customers.

■ In our review of the Commission's ruling on this point we are mindful of the Supreme Court's admonition that "Under this [Natural Gas] Act the appropriateness of the formula [for allocation of costs] employed by the Commission in a given case raises questions of fact, not of law." Colorado Interstate Gas Co. v. Federal Power Comm., 1945, 324 U.S. 581, 590, 65 S.Ct. 829, 833, 89 L.Ed. 1206. In view of the conceded fact that the usual method of allocation of fixed costs would lack normal significance in this case, and in view of the above factors stressed by the Commission, we think petitioner has established no more than that reasonable men might differ in judgment whether volumetric allocation was more appropriate in this case than an allocation on one of the formulae offered by petitioner, each of which attempted to give some weight to demand factors through use of figures other than the usual peak day ratio. In such circumstances the choice made by the Commission can not be reversible error.

6. Since a large proportion of the gas sold to jurisdictional customers is ultimately consumed for space heating purposes, much of it by householders, the variation between peak day and average day demands of jurisdictional customers is usually much larger than the same variation is for nonjurisdictional customers, most of whom use the gas for industrial purposes. In the case at bar, the "load factor" of jurisdictional customers was alleged to be 39%—i. e., for every 100 units of gas demanded on the peak day, .39 units were demanded on the average of all days in the test period, whereas the load factor for the nonjurisdictional customers was alleged to be 90%. It is thus obvious that if fixed costs are allocated on the basis of peak day demands, the jurisdictional customers must bear a heavier share of the load than if such costs are allocated on the basis of average day requirements or total volume.

7. Under the first method fixed costs were allocated on the basis of current monthly contract demand responsibility. Under the second method fixed costs were allocated on the basis of current monthly billing demands. Under the third method fixed costs were allocated on the basis of the maximum contract demand responsibility projected for the fifth year of operations.

Finally, we have not overlooked petitioner's claim that Section 5(a) of the Natural Gas Act will be violated by the rate which the City of Corinth will pay under the order issued May 1, 1952. But we are not persuaded that on the facts here there is any such rate increase as Section 5(a) prohibits.

The orders under review will be affirmed.