540 P.2d 775

**INTERMOUNTAIN GAS COMPANY,**
**Appellant,**

v.

**IDAHO PUBLIC UTILITIES COMMIS-**
**SION, Respondent.**

No. 11726.

Supreme Court of Idaho.

Sept. 5, 1975.

Barry Marcus of Marcus & Marcus, Boise, for appellant.

Wayne L. Kidwell, Atty. Gen., Boise, Gary L. Montgomery, of the Idaho Public Utilities Commission, Boise, for respondent.

BAKES, Justice.

On October 3, 1973, the applicant-appellant Intermountain Gas Company filed with the respondent Idaho Public Utilities Commission a proposed tariff designed to increase its rates and charges for natural gas service in Idaho. The rates in the proposed tariff would have increased the $37 million annual revenue generated by the existing rates by approximately $4.8 million. Pursuant to its authority under I. C. § 61–623, the Commission suspended the effectiveness of these rates during the proceedings before it and pending its final order.

On December 11, 1973, the Commission received prepared direct testimony from Intermountain's witnesses, then recessed the hearing until further notice. On January 8, 1974, the Commission issued its notice of a continued hearing scheduled for February 12, 1974. On February 12 and 13, 1974, Intermountain's witnesses were cross-examined, and redirect and re-cross examination testimony was also received. The Commission heard oral argument on May 1, 1974, and issued its order on June 26, 1974. The order granted Intermountain authority to increase its rates so that Intermountain would receive increased annual revenue of approximately $3.4 million, directed Intermountain to file proposed tariffs producing such increased revenue, and further directed Intermountain to discontinue the sale of natural gas appliances within a period of one year from the date of the order.

Intermountain petitioned the Commission for a rehearing, contending (1) that the Commission had no authority to order it to discontinue its gas appliance sales business and that there was no evidence in the record upon which the Commission could base the order to discontinue the business; (2) that the rate of return it had been allowed was inadequate; (3) that the Commission

had improperly calculated Intermountain's working capital requirements; and (4) that the Commission had not properly considered all of the evidence before it in determining Intermountain's revenue deficiency. On August 14, 1974, the Commission by order denied Intermountain's petition for rehearing. From these two orders of the Commission, Intermountain appealed. For the reasons hereinafter given, we set aside the orders of the Commission.

This case separates into two distinct substantive areas: those issues pertaining to the rate-setting process, and those issues pertaining to the order that Intermountain divest itself of its gas appliance sales business. We shall discuss these issues in turn, beginning with those pertaining to the rate-setting process.

I

RATE INCREASE ISSUES

The Idaho Public Utilities Commission adopted the following method of setting the rates Intermountain may charge its customers. First, the rate base was determined. The rate base consists of the capital invested in the utility[1] upon which the company is entitled to a fair and just return. *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). There are two components to Intermountain's rate base:

the net utility plant and the working capital. The net utility plant is the capital which the company has invested in the utility plant, consisting of the gas plant in service and construction work in progress, less the depreciation reserve and the amount the customers have contributed to the company in aid of construction. The working capital is the capital which the company has invested in the cash needs of the utility, consisting of an " 'allowance for the sum which the Company *needs to supply from its own funds* for the purpose of enabling it to meet its current obligations as they arise and to operate economically and efficiently'." *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission,* 203 F.2d 494, at 498, (3d Cir. 1953) (emphasis in original).

Next the Commission made its determination of a fair overall rate of return, i. e., the Commission determined the percentage of the rate base the company was entitled to recover as annual net operating income from its utility business. The Commission calculated the net operating income that it would allow the company to receive from its utility operations by multiplying the dollar amount of the rate base by the percentage the Commission had determined to be the fair rate of return. This figure was then compared with the net operating income of the company from its utility business[2] during the one year test period.

---

1. In its brief the Commission states that Intermountain has included its merchandising program in the rate base. It is unclear from the record how much, if any, of the capital investment in this non-utility business has been included in the rate base as utility plant rather than listed in Intermountain's balance sheets as other property and investments. However, the record is clear that the Commission excluded Intermountain's gas appliance inventory from the working capital allowance. Order No. 11507, June 26, 1974, p. 6. Sec. Tr., Vol. II, p. 386. Intermountain has not contested this exclusion; indeed, in the portion of its brief discussing the order to discontinue the gas appliance sales business, it suggests that it would be appropriate for the Commission to require a complete separation of the capital invested in the utility and non-utility portions of its business in the data submitted to the Commission for rate-making

purposes and to include only the former in the rate base.

2. In its brief Intermountain states that the Commission included revenues and losses from the gas appliance business in the operating expenses account of the utility business. The record shows that Intermountain's losses in the gas appliance business have apparently been included as expenses offsetting revenues from the sale of gas rather than accounted for as other income or loss apart from the utility business. Ex. 2, Sch. 3, Sec. Tr., Vol. I, pp. 163–165. In its brief, Intermountain proposes that the Commission may require it to separately list the profits and losses in the utility and non-utility portions of its business and to require that any losses in the non-utility business be borne by Intermountain's stockholders rather than made up by Intermountain's utility customers.

The deficiency in the net operating income was calculated by subtracting the test period net operating income from the utility business from the Commission's allowable net operating income as calculated by multiplying the rate base by the Commission's determined fair rate of return.

Finally, the Commission calculated the additional net taxable income the company must earn to generate this additional net operating income from the utility business after payment of state and federal income taxes. This final calculation represented Intermountain's revenue deficiency, i. e., the additional revenue the Commission in its order allowed Intermountain to obtain by raising its rates.[3]

Intermountain does not argue that the Commission has used an improper method to calculate the amount by which Intermountain will be allowed to increase its rates. However, Intermountain argues that (1) the working capital allowance was inadequate, (2) the Commission's determination of Intermountain's net operating income during the test year was inaccurate, and (3) the overall rate of return allowed upon the rate base was inadequate. Intermountain further argues that the rate of return allowed to its common stock share-

3. The explanation of how the Commission determined Intermountain's revenue deficiency was taken from Order No. 11507, June 26, 1974, pp. 3–10, Sec. Tr., Vol. II, pp. 383–390. The following table, showing the figures used by the Commission in calculating the revenue deficiency, and Intermountain's asserted revenue deficiency, was constructed from data contained in the Order, the record on appeal, and Intermountain's appellant's brief.

| | Commission's calculation | Intermountain's calculation |
|---|---|---|
| Gas plant in service | $80,751,254 | $80,751,254 |
| | 5,906 | 5,906 |
| Total utility plant | $80,757,160 | $80,757,160 |
| Less: | | |
| Depreciation reserve | $15,238,625 | $15,238,625 |
| Contribution in aid of construction | 46,680 | 46,680 |
| Total deductions | $15,285,305 | $15,285,305 |
| Net utility plant | $65,471,855 | $65,471,855 |
| Add working capital allowance* | 1,157,266 | 4,190,331 |
| Rate base | $66,629,121 | $69,662,186 |
| Rate of return | 8.73% | 9.118%** |
| Allowable net operating income (Rate of return x rate base) | $ 5,816,722 | $ 6,351,798 |
| Test period net operating income*** | $ 4,140,692 | $ 4,023,443 |
| Net operating income deficiency (difference between last 2 figures) | $ 1,676,030 | $ 2,328,355 |
| Additional revenue necessary to eliminate deficiency**** | $ 3,447,203 | $ 4,788,883 |

* These figures differ by one eighth of Intermountain's annual purchased gas costs ($2,703,101) plus one half of the annual franchise taxes collected by Intermountain ($329,964) for a total of $3,033,065. Intermountain has contested the adjustment for these items.

** The rate of return listed here is the figure used by Intermountain's expert witness as that of the minimum allowable overall rate of return. He testified that a fair rate of return should be in the range from 9.118% to 9.264%; his revised exhibits stated that a fair rate of return should be in the range of 9.142% to 9.277%.

*** These figures differ by $117,249, the difference in the figures appearing in an exhibit accepted by the Commission and a revised exhibit offered by Intermountain.

**** This is the additional taxable revenue which must be generated to yield the Net Operating Income Deficiency. It equals Net Operating Revenue Deficiency x 100/52 [representing a 48% federal income tax rate] x 100/93.5 [representing a 6.5% Idaho state income tax rate].

holders, i. e., the rate of return upon equity capital, was inadequate; so, even if the overall rate of return was reasonable when considered only as an overall rate of return, nevertheless it was inadequate because it did not produce a reasonable rate of return upon equity capital. Thus, Intermountain concludes that its calculation of the revenue deficiency, rather than the Commission's calculation, is correct and that it should be allowed to submit a proposed rate increase based on the higher figure. See footnote 3, *supra*. The Commission's allowance for working capital, its determination of the company's net operating income, its determination of a fair overall rate of return, and its determination of a fair rate of return upon equity capital have all been assigned as error. We shall consider these issues in turn.

A. WORKING CAPITAL ISSUES:

1. *Purchased gas costs*: The Third Circuit said in Alabama-Tennessee Natural Gas Company, *supra*, that working capital is an allowance for the sum which the company needs to supply from its own funds to meet current obligations as they arise. That court went on to say that:

"Since . . . expenses will eventually be paid for out of revenues received by the Company, the need for working capital arises largely from the time lag between payment by the Company of its expenses and receipt by the Company of payments for service in respect of which the expenses were incurred." 203 F.2d at 498.

Our examination of the authorities shows that regulatory bodies have almost uniformly estimated that if a utility bills its customers monthly the time lag between the utility's payment for goods and services in connection with operation and maintenance and the utility's receipt of payments from its customers is approximately 45 days. *E. g.*, see the cases listed in footnote 4, *infra*, which use this estimate whenever the regulated utility bills its customers monthly. Accordingly, regulatory agencies

have allowed utilities to include one eighth of their annual operating expenses for such goods and services, i. e., approximately their average expenditures for such items for a 45 day period, in the allowance for working capital. In Intermountain's last general rate increase proceeding, reported as Intermountain Gas Co., 86 P.U. R.3d 438 (Idaho PUC 1970), in addition to one eighth of Intermountain's annual expenses for goods and services purchased in connection with operations and maintenance, the Commission allowed Intermountain to include as part of its working capital allowance one eighth of its annual cost of purchased gas from its wholesale supplier. In the proceeding from which this appeal was taken, however, the Commission excluded all purchased gas costs from the allowance for working capital. The Commission thereby reduced Intermountain's requested allowance for working capital by $2,703,101, one eighth of Intermountain's annual cost of purchased gas. (See footnote 3, *supra*, for the effect of this exclusion upon the requested rate increase.) The Commission gave the following reasons for this decision:

"A majority of regulatory commissions do not allow [purchased gas costs] to be included in working capital and in nearly every case where purchased gas costs are allowed, in whole or in part, the inclusion of this item in working capital has been supported by a time lag study. We recognize that the Commission did not treat specifically this subject in its order in the last general rate proceeding for the Applicant. However, this Commission has not and does not now permit the inclusion of purchased power costs by electric utilities subject to its jurisdiction nor has it allowed the inclusion of purchased gas costs as a part of working capital by the other natural gas utility under this Commission's jurisdiction. Therefore, to achieve consistency in this matter, the Commission will not permit the inclusion of purchased gas costs in Applicant's working capital portion of

the rate base at this time. The Commission in subsequent rate proceedings involving natural gas utilities will give further consideration to the inclusion of a portion of purchased gas costs in working capital if it is supported by competent time lag studies." Order No. 11507, June 26, 1974, p. 5. Sec. Tr., Vol. II, p. 385.

 Intermountain argues that since it relied upon the previously established policy of the Commission in preparing its case, that the Commission should be bound to use the same method of determining the working capital allowance as it had used in the previous proceedings to which Intermountain was a party, at least so long as the Commission has not shown a change of circumstances warranting a modification of previously established policy. However, because regulatory bodies perform both legislative as well as judicial functions in these proceedings, they are not so rigorously bound by the doctrine of *stare decisis* that they must decide all future cases in the same way as they have decided similar cases in the past. So long as regulatory bodies adequately explain their departure from prior rulings so that a reviewing court can determine that their decisions are not arbitrary or capricious, orders based upon positions substantially different than those taken in previous proceedings can be upheld. See *Federal Communications Commission v. WOKO, Inc.*, 329 U.S.

223, 67 S.Ct. 213, 91 L.Ed. 204 (1946); *Federal Trade Commission v. Crowther*, 139 U.S.App.D.C. 137, 430 F.2d 510 (1970). There is considerable authority that one eighth of a gas or electric company's annual costs for purchase of gas or electricity will not necessarily be included in the allowance for working capital.[4] Furthermore, Burton L. Moore, Intermountain's vice president and treasurer for the management of the Budgets and Reports Department agreed with the statement of the Commission's counsel that if Intermountain's customers paid their bills as they came due, "it is a fair statement that it doesn't take 45 days to get reimbursed for gas that [Intermountain] ha[s] purchased from [its supplier.] It is something considerably less than that . . . ." Rptr. Tr., Vol. II, p. 135. This authority, Moore's testimony, and the Commission's decision to treat with uniformity purchased power costs of all electric utilities and purchased gas costs of all natural gas utilities that it regulates are sufficiently persuasive reasons to allow the Commission to alter its previously established policy regarding the applicant. It has not acted arbitrarily or capriciously in doing so.

Intermountain further argues that since it had not been given notice that the Commission staff would oppose its request that purchased gas expenses be included in the allowance for working capital that it was denied a fair hearing upon this issue be-

4. E. g., the following cases have disallowed the inclusion of this item in working capital upon the ground that there was no substantial lag time between the utility's payment for the gas and the payment by the utility's customers: *Rhode Island Consumers' Council v. Smith*, 322 A.2d 17 (R.I.1974); *Michigan-Wisconsin Pipeline Co.*, 13 F.P.C. 326 (1954); *Cities of Cleveland and Akron v. Hope Natural Gas Co.*, 3 F.P.C. 150 (1942), *rev'd* 134 F.2d 287 (4th Cir. 1943), *rev'd* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Niagara Mohawk Power Co.*, 92 P.U.R.3d 461 (N.Y. Pub.Serv.Comm.1971). Other cases have disallowed the inclusion of this item in working capital without any reference to the lag time between the utility's payment for power or gas and the customer's payment to the utility for power or gas: *Gainesville Gas Co.*, 89 P.U.R.3d 310 (Fla.Pub.Serv.Comm.1971); *Newport Gas Light Co.*, 85 P.U.R.3d 257 (R.I.Pub.Util.Comm.1970). Still others give some allowance for purchased gas or electric costs, but not a 45 day allowance: *Northland Utilities Ltd.*, 85 P.U.R.3d 432 (Alta.Pub.Util. Brd.1970) (15 day allowance); *St. Joe Natural Gas Co.*, 67 P.U.R.3d 467 (Fla.Pub. Serv.Comm.1967) (15 day allowance); *Michigan Consolidated Gas Co.*, 36 P.U.R.3d 289 (Mich.Pub.Serv.Comm.1960) (10.11 day allowance); *New Jersey Natural Gas Co.*, 6 P.U.R. 3d 249 (N.J.Brd.Pub.Util.Comm.1954) (1 half month allowance); *Vernah S. Moynston, d/b/a Hobbs Gas Co.*, 48 P.U.R.3d 459 (N. Mex.Pub.Serv.Comm.1963) (1 month allowance).

cause it had not been able to make the type of lead-lag studies which the Commission in its order indicated might persuade it to allow a portion of these purchased gas costs in the allowance for working capital.

■ However, this argument misconstrues the purpose of appellate review of the Commission's rate-making proceedings. Our purpose is not to analyze each step of the rate-setting process to determine whether the regulatory agency was correct in its decision, but to look at the overall effect of the rate fixed to determine whether the return to the utility is reasonable and just. As the Supreme Court of the United States stated in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944):

"It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." 320 U.S. at 602, 64 S.Ct. at 288.

Thus, so long as the Commission has adequately explained why it disallowed purchased gas costs from the working capital allowance, and this exclusion does not result in an unjust and unreasonable return to the utility, the Commission was not required to allow Intermountain to include purchased gas costs in the working capital allowance in the absence of a lead-lag study. However, under the authority of I. C. §§ 61–624, 61–629, Intermountain may move that further proceedings be held to alter or amend the order, and we hold that it may initiate new proceedings to introduce into evidence the results of a lead-lag study and that the Commission must take such a study into consideration in determining the working capital allowance.

■ Finally, we note that in the case of *Idaho Underground Water Users Ass'n v. Idaho Power Co.*, 89 Idaho 147, at 164, 404 P.2d 859 (1965), we said that "the sum necessary for working capital of a utility is addressed to the sound discretion of the Commission, and in the absence of an abuse of discretion will not be set aside." *See also Petition of Mountain States Telephone and Tel. Co.*, 76 Idaho 474, 284 P.2d 681 (1955). For this reason, and because the Commission has adequately explained its departure from its prior practice, based upon this record we uphold the decision by the Commission totally excluding all purchased gas costs from the working capital allowance. However, we recognize that Intermountain operated under a larger working capital allowance during the test year upon which this rate proceeding was based than it would pursuant to the Commission's order. In the event that further proceedings are conducted upon the rate-setting question, if Intermountain can show that this reduced allowance for working capital will result in increased operating expenses, e. g., if because the working capital allowance has been reduced, thereby reducing the rate base and return on the rate base, it must engage in additional short term borrowing because its revenues do not exceed expenditures to the extent they did in the test year, then Intermountain must be given an opportunity to present evidence of the adjustments to the data collected during its test year that would have resulted had Intermountain then been using the smaller allowance for working capital.

*2. Franchise taxes.* Intermountain also objects to another adjustment to the working capital allowance which differed from the Commission's formulation of the allowance in the 1970 rate-making proceeding:

reduction of the working capital allowance by one half of the amount of the franchise taxes annually collected by Intermountain from its customers. The franchise tax is a sum Intermountain collects from those customers residing within municipalities which impose a fee upon Intermountain for the privilege of doing business within the municipality. A portion of this tax is collected from the customers in each of Intermountain's twelve monthly billings, but Intermountain remits the franchise tax collected to the municipalities only once annually, on April 1. The Commission staff recommended that the working capital allowance be reduced by an amount equal to one half of the franchise taxes annually collected because it concluded that this amount of money, on the average, is available to Intermountain for the payment of its operating and maintenance expenses, and thus the amount of money which the investors must supply as working capital is correspondingly reduced. The Commission adopted the staff's position and reduced the working capital allowance by one half of the amount of franchise taxes annually collected, or $329,964. (See footnote 3, *supra,* for the effect of this adjustment upon the requested rate increase.)

■ Intermountain argues that it is improper to deduct one half the franchise taxes received from the working capital allowance when the 45 day allowance method is used to estimate the company's working capital requirements. We disagree. As the Court said in *Alabama-Tennessee Natural Gas Co., supra*:

> "[T]he need for working capital arises largely from the time lag between payment by the Company of its expenses and receipt by the Company of payments for service in respect of which the expenses were incurred. (Citation omitted). But there are time lags which work in favor of the Company as well as those which work against it. The Company no more pays immediately every liability accrued than do its customers. In determining the need for working

capital, the Commission may quite reasonably and properly take into account factors which reduce the need as well as those which increase it." 203 F.2d at 498.

Thus, the Commission could properly take into account the cash generated by the franchise tax receipts in determining the company's need for working capital and reduce the working capital allowance by an amount corresponding to the average franchise tax receipts which the company has available to meet its normal operating and maintenance expenses.

■ The company argues, however, that even if its working capital allowance may be reduced by an amount representing the average franchise tax receipts available to the company, there was no evidence introduced in the hearing below that showed that one half of the amount collected was on the average available to the company. Although no evidence was introduced showing the amount of franchise taxes collected in each month of the year, the testimony of Burton L. Moore, Intermountain's manager of budgets and receipts, tended to indicate that the franchise taxes were geared primarily to consumer use and that the bulk of them were collected in the winter months preceding the April 1 payment to the municipalities. If this be the case, Intermountain may introduce evidence in subsequent proceedings held before the Commission showing that less than one half of the franchise taxes annually collected by it are, on the average, available to meet its normal operating and maintenance expenses. Otherwise, the Commission is entitled to use this estimate of the amounts available, much as the Commission is entitled to estimate the utility's average expenses for operation and maintenance for a 45 day period as the working capital requirement of the utility. We will not set aside such estimates. As this Court said earlier, "[T]he sum necessary for working capital of a utility is addressed to the sound discretion of the Commission, and in the absence of an abuse of discre-

tion will not be set aside." *Idaho Underground Water Users Ass'n v. Idaho Power Co., supra,* 89 Idaho at 164, 404 P.2d at 868.

■ Finally, Intermountain makes the same arguments in connection with the franchise tax adjustments as it made in connection with purchased gas costs with respect to lack of notice about the adjustment to the working capital allowance and the lack of a compelling justification for the change from prior Commission policy. The Commission did not need to give notice concerning this adjustment because Intermountain supplied the relevant data needed to make the adjustment without notice, and thus Intermountain was not prejudiced in this regard by lack of notice. Furthermore, we believe that the Commission has adequately explained why it modified its past policy by reducing the working capital allowance by a sum representing average franchise taxes collected and available to Intermountain to meet its normal expenses. The Commission said:

"We will accept the staff's adjustments [reducing the working capital allowance by one half of the franchise taxes collected] but are of the opinion that a proper method would be to use the average of the monthly tax collections for the determination of the amounts of such deduction." Order No. 11507, June 26, 1974, p. 6. Sec. Tr., Vol. II, p. 386.

■ As we said with respect to purchased gas costs, our function on review is not to analyze each step of the rate-setting process to determine whether the agency was correct in that decision, but to determine the overall impact of the rate order. We cannot say that using the one half estimate is unreasonable and unjust in its consequences, and we will not substitute our judgment upon the matter for that of the Commission. However, the Commission itself has expressed a desire to base its order on more accurate data. If further rate-making proceedings are held, the Commission, following its enunciated poli-

cy, must allow Intermountain to introduce evidence upon average monthly franchise tax receipts.

## B. NET OPERATING INCOME ISSUE:

■ Intermountain claims that the Commission understated its revenue deficiency because it found Intermoutain's net operating income during the test year to be $117,249 greater than it actually was. (See footnote 3, *supra,* for the effect of this determination upon the requested rate increase.) The Commission and Intermountain have differently determined Intermountain's net operating income because Intermountain relied upon the figures it submitted in a second revision to an exhibit which had originally been introduced at the December 11, 1973, hearing, while the Commission adopted the figures that Intermountain had submitted in its first revision to that exhibit. The figures in the first and second revised exhibits differ by a $188,195 reduction of net taxable income and a $117,249 reduction in net operating income (after tax income). Intermountain claims this represented the final adjustments to earlier data caused by (1) reduced net receipts from sale of gas, and (2) reduced interest deductions for income taxes because of sale of bonds at a lower interest rate than originally anticipated. Intermountain argues that the Commission, by basing its finding of the revenue deficiency on the information contained in the first revised exhibit rather than the second revised exhibit, has ignored the evidence before it and has entered a finding contrary to the evidence, an arbitrary finding which violates Intermountain's right to a fair hearing under due process of law. However, the record supports the Commission's assertion that it did not refuse to consider this exhibit; rather, it found that the adjustments made between the first and second revised exhibits had not been adequately explained and ruled that it was not bound to adopt or accept the second revised exhibit for the fol-

lowing reason, which was given in its order denying Intermountain's petition for rehearing:

> "The supporting testimony with respect to these adjustments was incomplete and left numerous questions in the Commission's mind as to·the derivation of some of the figures, and their accuracy. One of the major adjustments relates to normalization for lost and unaccounted-for gas, which adjustment was an issue at a previous tracking increase hearing. Commission staff attempted through cross examination to clarify these items, but the Applicant's witness was either unwilling or unable to substantiate or explain said adjustments to the satisfaction of the Commission." Order No. 11572, August 14, 1974, p. 8. Sec. Tr., Vol. II, p. 410.

The Commission did not refuse to consider the second revised exhibit. After examining that exhibit and the testimony regarding it, the Commission determined that the adjustments between it and the first revised exhibit had not been adequately explained and chose instead to rely upon the figures in the first revised exhibit. The Commission's findings upon issues of fact is conclusive upon appeal if supported by substantial competent evidence. *Washington Water Power Co. v. Idaho Public Utilities Commission*, 84 Idaho 341, 372 P.2d 409 (1962). We uphold the Commission's determination of the utility's net operating income for the test year.

## C. RATE OF RETURN ISSUES:

Intermountain called two financial consultants to give their expert opinions upon the rates of return which the Commission should allow a company with Intermountain's capital structure. Mr. Barrie Wigmore, a member of the Public Utility Group in the firm of Goldman, Sachs & Co., of New York City, testified primarily upon the rate of return those with an equity interest in the company, the common stockholders, should receive. Wigmore testified that because on March 31, 1973, Intermountain's common stock represented only 28.32% of Intermountain's total capitalization, a precentage of capitalization which he recommended should be increased to 35% to protect the common share holders' investments, that the common shareholders were in a somewhat precarious position and would require a larger rate of return upon equity capital to protect their investment than shareholders in a company the common equity share of which was a higher percentage of total capitalization. In his opinion, the return on equity capital should be at least three times the amount required to service a utility's long term debt. Using this standard, he calculated that a 14.44% return upon the common shares was necessary to protect the common shareholders' interest in Intermountain. He also testified that it was necessary for Intermountain to sell additional shares of common stock at a price equal to or greater than the shares' book value in order to protect the common shareholders' equity interest. He further testified that Intermountain was unable to do this because its common stock was selling below book value. He felt that in order for Intermountain to be able to sell additional common stock at a price greater than its book value of $18.00 per share that the company needed to establish earnings of $2.61 per share to create a market for the stock, and that a 14.5% return upon equity capital was necessary to create such earnings per share.

Mr. Michael Rascon, a consultant with the firm of H. Zinder & Associates, Inc., of Washington, D.C., gave his expert opinion upon both the overall rate of return and the rate of return upon equity capital that the Commission should allow Intermountain. The bulk of Rascon's testimony concerned his determination of the overall rates of return and the rates of return upon equity capital earned by comparable public utilities. Rascon selected 16 electric companies and 14 gas companies which he testified were comparable to Intermountain, the overall rates of return and rates

of return upon equity capital of which were to be compared with Intermountain's. Rascon testified that in 1972 Intermountain had earned 8.82% on its average total capitalization while the comparable gas companies had earned 9.34% and comparable electric companies 9.06%. His exhibits showed that for the year 1972 Intermountain had earnings upon equity capital of 12.56% and for the three year period 1970–72 had earnings on equity capital of 12.07%, while he testified that the 14 comparable gas companies in 1972 had average earnings on equity capital of 13.18% and for the three year period 1970–72 had average earnings on equity capital of 13.-28%.[5] He testified that the 16 comparable electric companies had average earnings upon their average equity capital of 13.-33% in 1972 and 11.79% for the 1970–72 period.[6] His exhibits showed that during 1972 Intermountain's average equity ratio (the percent of total capitalization represented by common stock) had been 29.09% while he testified that during that same year the average equity ratio of the comparable gas companies had been 36.89% and of the comparable electric companies 38.95%. He further testified that although a rate of return upon equity capital of approximately 13.5% may be adequate for a utility with an equity ratio like those of the comparable utilites, Intermountain, which had a much smaller ratio of equity capital to total capitalization, must guarantee a return upon equity capital of from 14.5% to 15% in order to continue to attract new capital and that this rate of re-

turn upon equity capital could only be achieved by allowing an overall rate of return of between 9.118% and 9.264%. (In his revised exhibit submitted when he appeared for cross examination, he recommended an overall return to capital of 9.-142% to 9.277%.) According to Rascon these figures for the overall rate of return and the rate of return upon equity capital were the proper rates of return to be allowed if Intermountain's earnings were to be on par with those of comparable companies and if the integrity of its equity capital was to be preserved.

Although the testimony of these experts was uncontradicted, the Commission did not allow Intermountain the rates of return that the expert witnesses had testified were necessary. During cross examination, Rascon acknowledged that one of the gas companies he had selected as comparable to Intermountain, the Alabama-Tennessee Natural Gas Company, was not primarily a retail seller of gas with thousands of small customers, but was a wholesale gas pipeline company, a kind of business which is or may be more speculative than the retail distribution of gas. The Commission determined that Alabama-Tennessee was not a comparable company for this reason and excluded it from the list of utilities it considered to determine the returns made by comparable companies. Alabama-Tennessee had been by far the most profitable of the companies selected by Rascon. According to the Commission's calculation, excluding it from the list of comparable gas companies reduced the average return

---

5. Rascon's testimony (Rptr.Tr., Vol. I, p. 130) and his Ex. 8, Sch. 20 (Sec.Tr., Vol. I, p. 208), which both state that during the three year period of 1970–72 the comparable gas companies had an average return to equity capital of 13.28% on an average equity ratio of 38.32%, are in conflict with his Ex. 8, Sch. 15 (Sec.Tr., Vol. I, p. 203), which shows that during the years 1970, 1971 and 1972 the comparable gas companies had average returns to equity capital of 12.02%, 11.34% and 13.18%, respectively, on average equity ratios of 37.84%, 36.71% and 36.89%, respectively.

6. Rascon's testimony (Rptr.Tr., Vol. I, p. 130) and his Ex. 8, Sch. 21 (Sec.Tr., Vol. I, p. 209), which both state that during the three year period of 1970–72 the comparable electric companies had an average return to equity capital of 11.79% on an average equity ratio of 38.20%, are in conflict with his Ex. 8, Sch. 16 (Sec.Tr., Vol. I, p. 204), which shows that during the years 1970, 1971 and 1972, the comparable electric companies had average returns to equity capital of 12.33%, 12.42% and 13.33%, respectively, on average equity ratios of 39.17%, 38.49% and 38.95%, respectively.

on common equity of the remaining 13 gas companies to 12.19% on an average equity ratio of 36.86%. Using these figures, the Commission determined the allowable rate of return in the following manner:

"If the rate earned on equity capital were adjusted to a percentage a little above the average return earned by the sixteen electric companies of 11.79 percent, and the return earned by the thirteen gas companies, after eliminating Alabama-Tennessee Natural Gas Company, of 12.19 percent, but lower than the earnings used by the witnesses of 14.5 percent to 15 percent, in the range of 13.0 percent to 13.5 percent, the overall cost of capital then becomes 8.681 percent and 8.827 percent respectively. This would indicate that the fair rate of return to be earned by the Applicant on the rate base should be in the range of 8.5 percent to 8.8 percent." Order No. 11507, June 26, 1974, pp. 9–10. Sec. Tr., Vol. II, pp. 389–90.

The Commission allowed an overall rate of return of 8.73%. (See footnote 3, supra, for the effect of this determination of a fair rate of return upon the requested rate increase.)

Intermountain argues that the rate of return adopted by the Commission is insufficient to allow Intermountain to attract new capital and is less than the rate of return earned by comparable utilities. Thus, it concludes that its constitutional rights have been violated, citing for that proposition two cases decided by the Supreme Court of the United States.

In the earlier of the two cases, *Bluefield Waterworks & Improvement Co. v. Public Service Commission of West Virginia*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923), the Court said:

"The question in the case is whether the rates prescribed in the commission's order are confiscatory and therefore beyond legislative power. Rates which are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service are unjust, unreasonable and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment. This is so well settled by numerous decisions of this court that citation of the cases is scarcely necessary: . . ." 262 U.S. at 690, 43 S.Ct. at 678.

The Court then set forth the so-called "comparable earnings" test:

"The company contends that the rate of return is too low and confiscatory. What annual rate will constitute just compensation depends upon many circumstances, and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally." 262 U.S. at 692–693, 43 S.Ct. at 679.

In the second of the two cases cited by Intermountain, *Federal Power Commission v. Hope Natural Gas Company*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), the Supreme Court set forth the so-called

"capital attraction" test, which listed additional factors that rate-making bodies must take into consideration along with those listed in *Bluefield*. The Court said:

"[T]he investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." 320 U.S. at 603, 64 S.Ct. at 288. (Citation omitted).

Intermountain argues that because the testimony of its two expert witnesses was uncontradicted that the Commission was bound to accept their conclusions upon the rates of return earned by comparable companies and the rates of return that Intermountain must earn in order to attract capital. It further argues that since the Commission was bound to accept the rates of return given by these witnesses that an order allowing Intermountain a lesser rate of return was a confiscation of its property in violation of the Fourteenth Amendment to the Constitution of the United States and the due process clause of the Constitution of Idaho. We disagree.

▆▆▆ First, the Commission's finding that Alabama-Tennessee Natural Gas Co. was not a comparable company was supported by the record. There was evidence in the record—Rascon's acknowledgment that Alabama-Tennessee was a wholesale gas pipeline supplier engaged in a kind of business that is frequently of a more speculative nature than retail gas distribution —to support the Commission's finding that Alabama-Tennessee was not a comparable

company and thus that finding is binding upon us. *Washington Water Power Co. v. Idaho Public Utilities Commission, supra*. Therefore, the Commission was justified in rejecting an expert's opinion which was based upon the capital structure and earnings record of a company which was not comparable. Neither was it obligated to accept conclusions based upon inconsistent data and exhibits concerning comparable companies. See footnotes 5 and 6, *supra*. Moreover, even if Alabama-Tennessee Natural Gas Company were a comparable company, that does not necessarily mean that the Commission was bound to award Intermountain the rate of return to which the expert witnesses testified it was entitled under the "capital attraction" or "comparable earnings" tests.

▆▆▆ The determination of reasonable rates of return by application of the "capital attraction" or "comparable earnings" tests, or by application of any other tests or considerations, is a legislative function. *United States v. Jones*, 336 U.S. 641, 69 S. Ct. 787, 93 L.Ed. 938 (1949); *Petition of Mountain States Telephone and Tel. Co., supra*. In performing such a function within its area of expertise, the Commission may draw its own conclusions from the facts without the aid of expert testimony, *Market Street Railway Co. v. Railroad Commission of State of California*, 324 U. S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (1945), and may make determinations contrary to the uncontradicted opinions of the experts, *Central Illinois Public Service Company v. Federal Power Commission*, 338 F.2d 682 (7th Cir. 1964); *New Haven Water Co. v. Public Utilities Commission*, 30 Conn.Sup. 149, 305 A.2d 863 (Conn.Com.Pl.1972). As the Supreme Court of the United States said in *Hope*, "The rate-making process under the [Natural Gas] Act, i. e., the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests." 320 U.S. at 603, 64 S.Ct. at 288. Some thirty years later, in the case of *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.

Ed.2d 312 (1968), that Court said that the factors enumerated in *Hope* and *Bluefield* are not the exclusive criteria by which the constitutionality of a rate-making process may be judged.

"The Court in *Hope* found appropriate criteria by inquiring whether 'the return to the equity owner [is] commensurate with returns on investments in other enterprises having corresponding risks,' and whether the return was 'sufficient to insure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.' These criteria . . . remain pertinent, but they scarcely exhaust the relevant considerations.

*"The Commission cannot confine its inquiries either to the computation of costs of service or to conjectures about the prospective responses of the capital market; it is instead obliged at each step of its regulatory process to assess the requirements of the broad public interests entrusted to its protection by Congress.* Accordingly, the 'end result' of the Commission's orders must be measured as much by the success with which they protect those interests as by the effectiveness with which they 'maintain . . . credit and . . . attract capital.'

"It follows that the responsibilities of a reviewing court are essentially three. First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. *The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.* Judicial review of the Commission's orders will therefore function accurately and efficaciously only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act. . . ." 390 U.S. at 790–792, 88 S.Ct. at 1372–1373. (Citations and footnote omitted, emphasis added).

 Our function upon appeal is "to determine whether the commission has regularly pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the constitution of the United States or of the state of Idaho." I.C. § 61–629. In reaching its decision allowing an overall rate of return of 8.73% and a return to equity capital in the range of 13.0% to 13.-5%, the Commisison has "regularly pursued its authority," i. e., it has not abused or exceeded its authority or made findings unsupported by substantial evidence or improperly employed its own methods of rate determination. Thus, so long as we determine that the order "may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests," we will not set aside the order of the Public Utilities Commission on the ground that it has violated Intermountain's rights under the due process clauses of the Constitutions of the United States and of the state of Idaho. As the Supreme Court said in *Permian Basin*:

"[T]he just and reasonable standard of the Natural Gas Act 'coincides' with the

applicable constitutional standards, and any rate selected by the Commission from the broad zone of reasonableness permitted by the Act cannot properly be attacked as confiscatory. Accordingly, there can be no constitutional objection if the Commission, in its calculation of rates, takes fully into account the various interests which Congress has required it to reconcile." 390 U.S. at 770, 88 S.Ct. at 1361. (Citation omitted).

Thus, the Commission is not constitutionally bound to base its decision solely on the "comparable earnings" and "capital attraction" tests. Therefore, even if the Commission were bound to accept the experts' opinions upon the necessary rates of return under the "comparable earnings" or "capital attraction" tests, that does not mean that the Commission would be constitutionally required to award those rates of return. Our examination of the rates of return earned by the comparable companies (which, of course, were deemed comparable to Intermountain by application of criteria which is necessarily inexact and arbitrary to some degree) shows that their rates of return vary over a broad spectrum. The Constitution permits a "broad zone of reasonableness" in rates of return, and we will not hold that any rate of return lower than the precise average rate of return of comparable companies or beneath the rate of return that expert witnesses testify is necessary under the "capital attraction" or "comparable earnings" test is necessarily beyond the "broad zone of reasonableness" permitted by the Constitution. The Commission's award was within the zone of reasonableness. We conclude that the rate of return awarded by the Commission is not confiscatory and not in violation of Intermountain's rights under the Fourteenth Amendment to the Constitution of the United States or the due process clause of the Constitution of Idaho.

## D. SUMMARY OF RATE ISSUES:

With respect to the Commission's adjustments to the working capital allowance from the last rate-making proceeding to which Intermountain was a party, we hold that the Commission properly excluded an allowance for purchased gas costs from the working capital allowance, but if further rate-setting proceedings are held Intermountain has a right to present evidence from a lead-lag study to show there is a payment lag that will justify some allowance for purchased gas costs in working capital. We further hold that it was not error for the Commission to reduce the working capital allowance by an amount equal to one half of the franchise taxes annually collected by Intermountain, but also hold that in the event of further proceedings upon the rate-setting issue that pursuant to the Commission's announced policy of basing this reduction of working capital upon exact data that Intermountain may introduce evidence to show what portion of the amounts collected are on the average available to it, and that the working capital allowance shall be adjusted accordingly. We hold that if these adjustments to working capital have caused any of Intermountain's test year data to be inaccurate that Intermountain has a right to request further proceedings under the authority of I.C. §§ 61–624, 61–629, to introduce evidence adjusting the data. We uphold the Commission's determination of Intermountain's net operating income and hold that the Commission did not err in basing its computations upon the first revised exhibit 4, schedule 1, but that Intermountain is not precluded from requesting further opportunity to explain the second revised exhibit and to prove that the adjustments contained therein are accurate. Finally, we hold that the rates of return allowed Intermountain upon its rate base and upon equity capital are not confiscatory in violation of Intermountain's rights under the Fourteenth Amendment to the Constitution of the United States or the due process clause of the Constitution of Idaho.

## II

### THE ORDER TO DIVEST THE RETAIL APPLIANCE BUSINESS

 The order of June 26, 1974, which was upheld by the Commission in the order of August 14, 1974, denying Intermountain's petition for a rehearing, contained the following language concerning Intermountain's retail gas appliance business:

"IT IS FURTHER ORDERED That the Intermountain Gas Company discontinue the sale of natural gas appliances within a period of one year from the date of this Order." Order 11507, June 26, 1974, p. 14. Sec. Tr., Vol. II, p. 394.

This order did not follow a hearing in which Intermountain had fair notice that the continuation of its retail gas appliance sales business was at issue, and accordingly it must be set aside. When Intermountain filed a proposed tariff for a rate increase it was necessarily put upon notice that the Commission would consider the questions traditionally raised in rate-making, such as the allowance for working capital and the allowable rate of return. Furthermore, Intermountain could reasonably be expected to anticipate that the Commission might compel Intermountain to segregate its utility and non-utility businesses, separating its capital investment in the retail sales business from the rate base and requiring the losses in the retail sales business to be borne by its shareholders and not spread among its utility customers. However, by filing for a rate increase, Intermountain was not put upon notice that, nor could it have reasonably anticipated that the question of whether it could continue to conduct its retail gas appliance business was before the Commission. As the Court of Appeals in the District of Columbia Circuit said in the case of *American Public Gas Association v. Federal Power Commission*, 162 U.S.App.D.C. 176, 498 F.2d 718 (1974), in which the question of whether certain gas producers had been denied due process by the FPC's actions was presented,

"The procedure chosen by the Commission must of course give the parties fair notice of exactly what the Commission proposes to do, together with an opportunity to comment, to object, and to make written submissions; and the final order of the Commission must be based upon substantial evidence." 498 F.2d at 722. Intermountain was never given notice that its right to continue the retail sales business was before the Commission until its witnesses were cross-examined some four months after it had requested its rate increase. "Due process requires that a party to contested proceedings before the commission must be afforded a full opportunity to meet the issues . . . ." *Washington Water Power Co. v. Idaho Public Utilities Commission, supra,* 84 Idaho at 346, 372 P.2d at 411. Intermountain did not have an opportunity to meet the issue of whether the continuation of its retail sales business was in the public interest and thus the order denied it due process. We do not, by this decision, intimate any opinion regarding the validity of an order such as this one; we merely hold that entering this order following this proceeding was a violation of due process.

## III

### DISPOSITION OF THE APPEAL

 Were this appeal being taken under the general rules of appellate procedure jurisdiction, we would reverse that portion of the order compelling Intermountain to discontinue the sale of natural gas appliances, uphold the Commission's ruling with respect to the allowable rate of return and the determination of Intermountain's net operating income, and remand the case to the Commission to conduct further proceedings upon the working capital allowance in order to allow Intermountain to present evidence concerning the lead-lag of purchased gas and the receipt of franchise taxes. However, the Idaho Constitution and the statutes defining our powers of appellate review on matters coming to us

**130**

from the Public Utilities Commission prevent us from doing this.

Art. 5, § 9, of the Idaho Constitution provides:

"§ 9. *Original And Appellate Jurisdiction Of Supreme Court.*—The Supreme Court shall have jurisdiction to review, upon appeal, any decision of the district courts, or the judges thereof, and any order of the public utilities commission, and any order of the industrial accident board: *the legislature may provide conditions of appeal, scope of appeal, and procedure on appeal from orders of the public utilities commission and of the industrial accident board. . . .*" (Emphasis added).

The statute relating to appeals from the Public Utilities Commission provides in part:

"61–629. *Matters Reviewable On Appeal.—Extent Of Review—Judgment.— . . . . Upon the hearing the Supreme Court shall enter judgment, either affirming or setting aside the order of the commission.* In case the order of the commission is set aside the commission, upon its own motion or upon motion of any of the parties, may alter or amend the order appealed from to meet the objections of the court in the manner prescribed in section 61–624." (Emphasis added).

Because we cannot affirm the Commission's order of June 26, 1974, which directed Intermountain to file tariffs for a proposed rate increase of approximately $3.4 million and to divest itself of its retail gas appliance business, or the order of August 14, 1974, which denied Intermountain's petition for a rehearing and upheld the first order in all respects, we must set them aside. We remind Intermountain and the Commission that I.C. § 61–629 gives either of them the right to move to alter or amend the order to meet the objections of this Court. We have already held that we have no objection to the rate-setting order as it stands and have further indicated how the Commission may alter or amend

its rate-making order without our objection and how it must alter it if further proceedings are held and Intermountain introduces evidence of the kind we have held will require further adjustments. However, any order by the Commission compelling Intermountain to discontinue its business of the retail sale of gas appliances without a full hearing preceded by notice cannot be upheld.

Orders of the Idaho Public Utilities Commission, *set aside.*

McQUADE, C. J., and McFADDEN, DONALDSON and SHEPARD, JJ., concur.