# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 37293-2010

THE BUILDING CONTRACTORS
ASSOCIATION OF SOUTHWESTERN
IDAHO,

      Appellant,

v.

IDAHO PUBLIC UTILITIES
COMMISSION and IDAHO POWER
COMPANY,

      Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, April 2011 Term

2011 Opinion No. 55

Filed: May 25, 2011

Stephen W. Kenyon, Clerk

Appeal from the Idaho Public Utilities Commission.

The order of the commission is affirmed.

Michael C. Creamer, Givens Pursley LLP, Boise, argued for appellant.

Kristine A. Sasser, Deputy Attorney General, Boise, argued for respondent Idaho Public Utilities Commission.

Lisa D. Nordstrom, Boise, argued for respondent Idaho Power Company.

_____

EISMANN, Chief Justice.

This is an appeal from an order of the Public Utilities Commission revising the allowances and refunds available to developers of residential subdivisions. We affirm the order of the Commission.

## I. FACTS AND PROCEDURAL HISTORY

On October 30, 2008, Idaho Power Company filed an application with the Idaho Public Utilities Commission seeking to modify its line extension tariff which applies to requests for electrical service that require the installation, alteration, relocation, removal, or attachment of Company-owned distribution facilities. The proposed modification would impact both the cost

of relocating and removing the Company's distribution facilities and the cost of extending service to previously unserved locations.

On December 10, 2008, Building Contractors Association of Southwestern Idaho ("Building Contractors") filed a petition to intervene in the proceeding, which was granted. The City of Nampa, the Kroger Company, and the Association of Canyon County Highway Districts also requested and were granted permission to intervene. The latter three intervenors were later joined by the Ada County Highway District, which intervened by filing a petition for reconsideration. This appeal does not involve the issues that these four intervenors raised.

The central issue in this case is the amount that developers must pay when the Company constructs distribution facilities to serve the lots in a new subdivision. For simplicity, we will only discuss charges related to installing single-phase residential service. The distribution facilities include line extensions and terminal facilities. For residential service, the cost of standard terminal facilities include the labor and material to install one overhead service conductor, one 25 kVA transformer to serve a 200 amperage meter base, and the power meter. Typically, the developer does not ask for the power meters to be installed. As homes are constructed in the subdivision, the homeowner requests to be connected to power, and the Company installs the drop wire from the transformer to the home and the meter at no cost to the homeowner.

Historically, the cost of constructing new distribution facilities has been paid partially from up-front capital contributions from developers and partially from electric rates charged to all customers. The up-front charge is either based upon the Company's estimate of the cost of the particular line extension job or specified in the applicable tariff for standard tasks or materials. The Company's estimate was prepared before construction, and the amount charged the developer was rarely adjusted after construction to reflect the Company's actual cost for the work done.

Under the prior tariff, the Company provided developers with a "line installation allowance," "per-lot refunds," and a "vested interest refund" to offset a portion of the developers' costs incurred in having the Company construct the distribution facilities. The line installation allowance is the portion of the estimated cost of the line extension that is funded by the Company at no charge to the developer. Under the prior tariff, it was equal to the Company's cost of providing and installing overhead single-phase transformers within the subdivision. The

2

developer had to pay the additional cost for underground facilities if those were requested. The per-lot refunds were sums refunded to the developer when a permanent residence connected to electrical service and occupied a lot inside the subdivision within five years. The per-lot refunds could be up to $800 each, and a single transformer could serve multiple lots depending upon their geographic configuration. The vested interest refund was a sum the developer could receive if another person outside the subdivision paid to connect to the line extension within five years.

In this proceeding, the Company sought to change the line installation allowance to a fixed sum of $1,780 for each single-phase transformer, to eliminate the per-lot refunds, and to shorten the time period for the vested interest refunds to four years. Building Contractors sought to increase the per-lot refunds to $1000 and to increase the time period for vested interest refunds to ten years.

The line extension allowance for a residence that was not in a subdivision had been the cost of standard terminal facilities plus either $1,300 for an all-electric house or $1000 for a house that did not have electric heat. The Company asked that the allowance for such residences also be changed to $1780 per transformer for single-phase service.

After considering written comments submitted by the parties, the Commission issued its initial order on July 1, 2009. It granted the Company's request to change the line extension allowance for all residences to a fixed sum of $1780 per single-phase transformer and to eliminate the per-lot refunds. It rejected both parties' requests to alter the time period for receiving vested interest refunds.

On July 13, 2009, Building Contractors filed a request for $28,386.35 in "intervenor funding" pursuant to Idaho Code § 61-617A. That statute permits the Commission to require certain regulated utilities to pay all or a portion of an intervenor's legal fees, witness fees, and reproduction costs. Building Contractors stated that the request was untimely under Commission rules due to "the inadvertent and unintentional oversight by its legal counsel with respect to the correct timing for submission of requests for intervenor funding," but it requested that the untimeliness be excused.[1] On July 22, 2009, Building Contractors also filed a petition asking the

---

[1] The request also noted in a footnote that "Building Contractors recognizes that Idaho Code § 61-617A limits the amount awardable as intervenor funding to $25,000." It apparently overlooked the fact that the $25,000 limit had been increased to $40,000 effective July 1, 2003. Ch. 41, § 1, 2003 Idaho Sess. Laws 162, 162-63.

Commission to reconsider its findings and conclusions regarding terminal facilities allowances, per-lot refunds, and the time period for making vested interest refunds.

On August 1, 2009, the Commission granted Building Contractors's motion for reconsideration with respect to the amount of the appropriate allowances, and it denied the motion with respect to extending the period for vested interest refunds and eliminating the per-lot refunds. On September 3, 2009, the Commission denied Building Contractors's request for intervenor funding because it was untimely. On November 9, 2009, Building Contractors filed a second request for intervenor funding.

Building Contractors submitted additional evidence and argument, and on November 20, 2009, the Commission issued its final order. It denied Building Contractors' petition for reconsideration and the second request for intervenor funding. Building Contractors then appealed.

## II.  ISSUES ON APPEAL

A.  Does the line installation allowance result in unlawful discrimination between new customers in and outside subdivisions or between new and existing customers?

B.  Is the line installation allowance supported by substantial and competent evidence?

C.  Did the Commission err in denying Building Contractors' requests for intervenor funding?

D.  Is Building Contractors entitled to an award of attorney fees on appeal?

## III.  ANALYSIS

**A.  Does the Line Installation Allowance Result in Unlawful Discrimination between New Customers in and outside of Subdivisions or between New and Existing Customers?**

Building Contractors alleges that the new line extension allowance of $1,780 per single-phase transformer violates Idaho Code § 61-315, which provides in part, "No public utility shall establish or maintain any unreasonable difference as to rates, charges, service, facilities or in any other respect, either as between localities or as between classes of service."

Building Contractors argues that the new tariff "authorizes a $1,780 allowance <u>per transformer</u> installed within a residential subdivision and a $1,780 allowance <u>per customer</u> outside of residential subdivisions." (Emphases in original.) According to Building Contractors, "This arrangement patently treats customers inside and outside subdivisions disparately because

4

in a subdivision a single transformer may serve multiple (up to ten) customers if those customers are located in sufficient proximity to each other, whereas, in the case of a single customer requesting service outside a subdivision, a transformer will only serve that one customer." Thus, it asserts that the Company's investment per electrical consumer in a residential subdivision could be less than the investment per electrical consumer outside of a subdivision.

Idaho Code § 61-315 requires that there be no unreasonable difference as to charges between classes of service. The class of service at issue here is constructing new distribution facilities to extend electrical service to a previously unserved location. Each person or entity who asks the Company to provide new distribution facilities is given the same amount as a line extension allowance—$1,780 for each single phase transformer installed. The amount of the allowance is the same for line extensions in subdivisions and outside subdivisions. Under Building Contractors' argument, a developer should receive a credit of $1,780 per lot, which could be up to $17,800 for one transformer if it could serve residences on ten lots. As the Commission stated in rejecting Building Contractors' assertion that there should be a per-lot allowance rather than a per-transformer allowance, "Permitting a per customer allowance rather than a per transformer allowance could lead to an allowance inside subdivisions that is greater than the cost of the terminal facilities required to provide service." The line installation allowance and the elimination of the per-lot refund do not violate Idaho Code § 61-315 with respect to line extensions in and outside of subdivisions.

Building Contractors also contends that the new tariff violates Idaho Code § 61-315 because it discriminates between new and old electricity customers as to the amount that the Company will invest in their distribution facilities. In making that argument, Building Contractors relies upon this Court's opinions in *Building Contractors Association of Southwestern Idaho, Inc. v. Idaho Public Utilities Commission*, 128 Idaho 534, 916 P.2d 1259 (1996) (herein called *Boise Water*), and *Idaho State Homebuilders v. Washington Water Power*, 107 Idaho 415, 690 P.2d 350 (1984). In the *Boise Water* case, the issue was "whether in allocating the entire increased cost of resource supply to new customers via increased hook-up fees the IPUC regularly pursued its authority to set nondiscriminatory rates." 128 Idaho at 538, 916 P.2d at 1263. The increased cost of resource supply was caused, in part, by new requirements of federal law and the need to build a new water treatment plant. We held that the increased hook-up fees for new customers violated Idaho Code § 61-315 "[t]o the extent that the

5

new hook-up fees are based on an allocation of the incremental cost of new plant construction required by growth and by the Safe Drinking Water Act." *Id*. at 539, 916 P.2d at 1264. In the *Homebuilders* case, the Commission required that the power company impose upon customers a "nonrecurring charge of $50 per installed kilowatt of capacity on all customers who installed electric space heating, or converted to electric space heating following March 1, 1980." 107 Idaho at 418, 690 P.2d at 353. The charge only applied to customers who had the option of choosing either natural gas or electricity for space heating. *Id*. at 416, 690 P.2d at 351. The Commission did so "to send to Water Power's customers a price 'signal' which would more accurately reflect the cost and availability of electricity." *Id*. at 418, 690 P.2d at 353. We held that "the Commission's order, which differentiates between customers using electricity for space heating prior to March 1, 1980, and customers who install or convert to electric space heating after that date, is an invalid classification and violates the legislative prohibition against discriminatory or preferential rates." *Id*. at 421, 690 P.2d at 356.

In both the *Boise Water* and *Homebuilders* cases, the Commission imposed a charge on new customers in order to pay for the increased cost of providing water and electricity respectively to all of the utility's customers. The charge was not based solely upon the cost of connecting the new customers to the utilities' distribution systems. In *Homebuilders*, we expressly stated that the case "presents no factors such as when a non-recurring charge is imposed upon new customers because the service they require demands an extension of existing distribution or communication lines and a charge is imposed to offset the cost of the utility's capital investment." *Id*.

There is nothing in Idaho Code § 61-315 that requires an identical per customer capital investment by the Company, even if that were possible to achieve. For example, the Commission's staff prepared an analysis of the costs for providing electrical service to five subdivisions completed under the prior tariff. The subdivisions ranged in size from 3 lots to 101 lots. The allowance for terminal facilities, and therefore the amount the Company invested to provide them, varied from $250.71 per lot in the 101-lot subdivision to $1159.33 per lot in the 3-lot subdivision.

As explained by the Commission: "Once new customers pay the nonrecurring charge/line extension costs, they become existing customers and pay pursuant to the same rate schedule as all other existing customers in their class. As such, there is no distinction between

6

new and existing customers in regard to nonrecurring rates and no rate discrimination." Building Contractors has failed to show that the new tariff violates Idaho Code § 61-315.

**B.  Is the Line Installation Allowance Supported by Substantial and Competent Evidence?**

Building Contractors contends that there is not substantial and competent evidence to support the new tariff.  It argues that the Commission did not address the factors mentioned in *Homebuilders* and *Boise Water*.  In *Homebuilders*, we stated, "Any such difference (discrimination) in a utility's rates and charges must be justified by a corresponding classification of customers that is based upon factors such as cost of service, quantity of electricity used, differences in conditions of service, or the time, nature and pattern of the use." 107 Idaho at 420, 690 P.2d at 355.  In *Boise Water* we similarly stated, "Any such difference in rates and charges must be justified by a corresponding classification of customers that is based on such factors as cost of service, quantity of resource use, differences in the condition of service or in the time, nature or pattern of the customers' use."  128 Idaho at 539, 916 P.2d at 1264. Building Contractors alleges that there are no findings as to these factors and no evidence in the record supporting other statements in the Commission's orders.  Whether there is substantial evidence supporting the Commission's findings depends upon what factual findings are necessary to decide the issues in the proceeding.

The Commission performs legislative as well as judicial functions in its proceedings. *Rosebud Enters., Inc. v. Idaho Public Utilities Comm'n*, 128 Idaho 609, 618, 917 P.2d 766, 775 (1996).  When exercising its legislative function, the Commission is not bound to decide future cases in the same way it had decided similar cases in the past.  *Intermountain Gas Co. v. Idaho Public Utilities Comm'n*, 97 Idaho 113, 119, 540 P.2d 775, 781 (1975).  There need not be facts in the record supporting the Commission's policy determinations made in exercising its legislative function.  *See Moon v. North Idaho Farmers Ass'n*, 140 Idaho 536, 545, 96 P.3d 637, 646 (2004) ("The existence of facts supporting the legislative judgment is to be presumed." (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938))).

This proceeding did not involve a difference in rates or charges between or among classes of customers.  Therefore, the factors listed above in *Homebuilders* and *Boise Water* were not relevant.  Rather, the Commission made a policy change.  Allowances and refunds are sums that

the Commission requires the Company to invest in distribution systems for new customers.[2] The Commission had previously set the allowances and refunds so that the Company would pay to connect a new customer an amount approximating the average amount it paid to connect an electricity customer in the past. In a 1995 order, the Commission stated, "We find that new customers are entitled to have the Company provide a level of investment equal to that made to serve existing customers in the same class." However, in this proceeding, the Commission changed that policy. "So long as regulatory bodies adequately explain their departure from prior rulings so that a reviewing court can determine that their decisions are not arbitrary or capricious, orders based upon positions substantially different than those taken in previous proceedings can be upheld." *Intermountain Gas Co. v. Idaho Public Utility Comm'n*, 97 Idaho 113, 119, 540 P.2d 775, 781 (1975). In making the policy change, the Commission stated that it "is addressing a fundamental principle of utility regulation: To the extent practicable, utility costs should be paid by those that cause the utility to incur the costs. If the 'cost-causers' do not pay, the electric rates for other customers will be higher."

Building Contractors states that its appeal "is not premised simply on the fact that the [new line extension] allowance is smaller than previously required, or that new customers may pay more to extend service than existing customers who accessed service when facilities costs were lower." It concedes "that there will be a cost difference between what new customers pay for line extensions as compared to old customers." It argues that the new tariff "results in new customers <u>overpaying</u> for distribution facilities, in Idaho Power <u>over-earning</u> on its investment to serve those new customers, and in existing customers necessarily being <u>subsidized</u> in the rates they pay." (Emphases in original.) Thus, it contends that the new tariff violates this Court's opinions in *Boise Water* and *Homebuilders*.

In both *Boise Water* and *Homebuilders*, the charges at issue were not based solely upon the cost of extending distribution facilities to new customers. Building Contractors's argument that new customers are "overpaying" for distribution facilities is not that they are paying more than those facilities cost the Company to construct. The overpaying argument is simply that with the lower amount of Company investment in distribution facilities resulting from the elimination of per-lot refunds, the Company will receive from rates charged new electricity customers more

---

[2] Building Contractors does not contend that there is any statute requiring the Company to invest in facilities to connect new customers.

than it invested in constructing the distribution facilities necessary to connect those customers to electrical service. Building Contractors asserts that under the former tariff the allowances and refunds resulted in Company investment that was quite close to the "per customer embedded cost of distribution," but the line extension allowances under the new tariff "no longer swing around *any* objective anchor that future customers, Commissions, or this Court can hold to." (Emphasis in original.) There is no statutory requirement that it do so.

"All charges made, demanded or received by any public utility . . . for . . . any service rendered or to be rendered shall be just and reasonable." I.C. § 61-301. The Commission has the authority to determine charges that are just and reasonable. I.C. § 61-502. In these proceedings, the Commission determined what would be a fair and reasonable allocation between the Company and new customers of the cost of constructing the distribution facilities necessary to connect those customers to electrical service. The Commission found that "Idaho Power's proposed fixed allowance of $1,780 for single-phase service and $3,803 for three-phase service represents a fair, just and reasonable allocation of line extension costs." Determining what is fair and reasonable is a discretionary determination. *See Quick v. Crane*, 111 Idaho 759, 772, 727 P.2d 1187, 1200 (1986) ("[J]udicial discretion 'requires an actual exercise of judgment and a consideration of the facts and circumstances which are necessary to make a sound, fair, and just determination, and a knowledge of the facts upon which the discretion may properly operate.'").

Idaho Code § 61-629 provides, "The review on appeal shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the constitution of the United States or of the state of Idaho." "[I]n regularly pursuing its authority the Commission must enter adequate findings of fact based upon competent and substantial evidence" and "it must set forth its reasoning in a rational manner." *Washington Water Power Co. v. Idaho Public Utilities Comm'n*, 101 Idaho 567, 575, 617 P.2d 1242, 1250 (1980). Here, the Commission's findings as to the Company's costs to construct distribution facilities to connect new electricity customers were supported by substantial and competent evidence. There is no contention that the sums that will be charged to developers for distribution facilities exceed the Company's costs in providing those facilities. The evidence supports the Commission's finding that it "is addressing distribution costs not resource costs." The Commission also set forth its reasoning in a rational manner for changing the allocation of those costs between the

9

Company and developers. With respect to the change in line extension allowances and refunds, the Commission stated, "These changes relieve one area of upward pressure on rates. Moreover, the Company's proposal is impartial to customer class, minimizes subsidization of terminal facilities costs, and carries the added benefit of administrative simplicity." As explained by Commission staff:

> Each new customer that is added requires an investment in distribution plant and terminal facilities. The new investment is undepreciated, while the investment upon which the Company's revenue requirement (and rates) is calculated was both lower on a per customer basis when originally made and is now partially depreciated. Therefore, when the new plant investment is booked by the Company, the resulting revenue requirement is higher per customer than it was before the new customers were connected. The Company then has two alternatives: increase rates to all customers to cover the increased revenue requirement, or decrease the revenue requirement by shifting more of the investment in new distribution/terminal facilities to the customer for whose benefit those facilities are built.

The Commission regularly pursued its authority, and there is no contention that the order appealed from violates any of Building Contractors's constitutional rights. We affirm the Commission's order adopting the new tariff.

## C. Did the Commission Err in Denying Building Contractors's Requests for Intervenor Funding?

On July 13, 2009, Building Contractors requested intervenor funding in the sum of $28,386.35. On September 3, 2009, the Commission denied that request as untimely under the Commission's rules of procedure. After the Commission had partially granted Building Contractors's request for reconsideration, Building Contractors filed a second request for intervenor funding on November 9, 2009. The amount it requested was $60,965.25, which included the sum denied in its first request. The Commission ruled that because the first request had been denied because it was untimely filed, it would not consider those sums. It also held that due to the granting of the reconsideration, the second request was timely filed as to the $32,578.90 incurred during the reconsideration phase of the proceedings.

Idaho Code § 61-617A(2) provides:

> The commission may order any regulated electric, gas, water or telephone utility with gross Idaho intrastate annual revenues exceeding three million five

hundred thousand dollars ($3,500,000) to pay all or a portion of the costs of one (1) or more parties for legal fees, witness fees, and reproduction costs, not to exceed a total for all intervening parties combined of forty thousand dollars ($40,000) in any proceeding before the commission. The determination of the commission with regard to the payment of these expenses shall be based on the following considerations:

> (a) A finding that the participation of the intervenor has materially contributed to the decision rendered by the commission; and
>
> (b) A finding that the costs of intervention are reasonable in amount and would be a significant financial hardship for the intervenor; and
>
> (c) The recommendation made by the intervenor differed materially from the testimony and exhibits of the commission staff; and
>
> (d) The testimony and participation of the intervenor addressed issues of concern to the general body of users or consumers.

The Commission has discretion in determining whether to award expenses to an intervenor under Idaho Code § 61-617A(2). *Idaho Fair Share v. Idaho Public Utilities Comm'n*, 113 Idaho 959, 963, 751 P.2d 107, 111 (1988) (*overruled on other grounds by J.R. Simplot Co. Inc. v. Idaho State Tax Comm'n*, 120 Idaho 849, 862, 820 P.2d 1206, 1219 (1991). Because the factors are connected by the word "and," the Commission must find that all four listed factors exist in order to award expenses under the statute.

The Commission found that Building Contractors's participation did not materially contribute to the decision rendered by the Commission. It stated that Building Contractors's arguments were essentially the same as it had presented in a 1995 proceeding and that the Commission did not find them persuasive then. Building Contractors argues that it presented evidence and arguments in this proceeding, but it has not shown how the Commission erred in concluding that such evidence and arguments did not materially contribute to the decision rendered by the Commission. Active participation in the proceeding is not sufficient to show material contribution to the ultimate decision. Building Contractors argues that the Commission misinterpreted this factor as providing that "a party only is entitled to intervenor funding if they prevail on an issue." (Emphasis in original.) Building Contractors does not point to any portion of the Commission's ruling so indicating, and we likewise have been unable to find any such language in the Commission's decision. Building Contractors has not shown that the Commission abused its discretion in denying the requested intervenor expenses.

**D. Is Building Contractors Entitled to an Award of Attorney Fees on Appeal?**

11

Building Contractors requests an award of attorney fees on appeal pursuant to Idaho Code § 12-117 and the private attorney general doctrine. To be awarded attorney fees under either of those provisions, the party must be the prevailing party on appeal. *Viking Constr., Inc. v. Hayden Lake Irr. Dist.*, 149 Idaho 187, ___, 233 P.3d 118, 131 (2010). Because Building Contractors is not the prevailing party on appeal, it is not entitled to an award of attorney fees on appeal. We therefore need not address whether, had it prevailed, attorney fees could have been awarded under either the statute or the doctrine.

## IV. CONCLUSION

We affirm the order of the Public Utilities Commission, and we award respondents costs on appeal.


Justices BURDICK, J. JONES, W. JONES, and HORTON **CONCUR**.