# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 38917

PETER KASEBURG, SHELAGH
KASEBURG, KASEBURG FAMILY
TRUST,

    Plaintiffs-Respondents.

STATE OF IDAHO, BOARD OF LAND
COMMISSIONERS, DEPARTMENT OF
LANDS,

    Defendants-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, February 2013 Term

2013 Opinion No. 56

Filed: May 2, 2013

Stephen W. Kenyon, Clerk

Appeal from the district court of the First Judicial District of the State of Idaho,
Bonner County.  Hon. Steve Verby, District Judge.

The decision of the district court is <u>reversed</u> as to application 219B and
<u>affirmed</u> as to application 219C and this case is <u>remanded</u> for action consistent
with this Opinion.  No costs or fees are awarded.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for Appellants.
Steven Schuster argued.

Finney, Finney & Finney, P.A., Sandpoint, attorneys for Respondents.  John A.
Finney argued.

_____

W. JONES, Justice

## I. NATURE OF THE CASE

Peter Kaseburg[1] is a littoral owner on Lake Pend Oreille who holds an encroachment

permit for a series of decaying wooden pilings that were driven into the lakebed in the 1930s.

With the exception of a single piling that a neighboring marina uses to anchor one of its docks,

the pilings have never had any known navigational purpose.  Kaseburg applied to the Idaho

Department of Lands ("IDL") for a permit to replace ten of the wooden pilings with steel pilings,

_____

[1] Peter's wife, Shelagh Kaseburg, and the Kaseburg Family Trust are also parties to the lawsuit.  However, because
Peter took all of the actions relevant to this lawsuit, Shelagh and the Trust are not mentioned further.

but failed to specify any navigational purpose for this proposal. The IDL considered the application a request for a nonnavigational encroachment permit and denied it after receiving several objections.

While a final decision was still pending on the first permit application, Kaseburg filed a second application for a permit to install a mobile dock system and mooring buoy. The IDL considered the second application a request for a permit for a navigational encroachment extending beyond the line of navigability. Again, the IDL received many objections and denied the application.

Kaseburg petitioned for judicial review by the First District Court for Bonner County, which reversed the IDL. The court held that all pilings are navigational encroachments as a matter of law, regardless of whether they have ever been used to aid navigation. This supposed error tainted the IDL's processing of both applications. Therefore, the district court set aside both denials. The IDL appealed to this Court. We reverse the district court with respect to the first application, but affirm the district court with respect to the second application.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Peter Kaseburg is a relative newcomer to Glengary Bay on Lake Pend Oreille in Bonner County, Idaho. He recently purchased a vacation home on a small sub-bay (the "Bay") which is part of the larger Glengary Bay. Kaseburg shares the Bay's shoreline with several other property owners: Gerald Bringhurst; Mark and Laurence Nelson; Tom and Marjorie Trulock; and George Congleton. Kaseburg's property extends to the north, around the corner of a point that defines the mouth of the Bay.

The area was originally homesteaded by the Nelson family. In 1937, the McLean family purchased land that included most of the Bay's shoreline. In the mid-1940s, Marjorie Trulock's father, Hennrick Heitman, purchased land that fronted on the remaining shoreline and began operating a marina there. The McLean and Heitman families owned all of the shoreline until the mid-1990s. To this day, the Heitman Docks marina continues to operate under the Trulocks' ownership.

In the water near Kaseburg's property stand a set of decaying wooden pilings. They are arranged in an L-shaped configuration. Seven individual pilings extend roughly perpendicular from the shoreline and to the south-southeast, terminating in a cluster of three pilings that stands at the corner of the "L." Another cluster of three pilings is adjacent to it to the west-southwest,

2

and, together with six more individual pilings, forms the other leg of the "L." In 1974 there were an additional two pilings above the low water mark. These two pilings have apparently rotted away entirely, and no longer exist.

The pilings were driven in the early 1930s, although their exact purpose is unknown. Due to their height, it is unlikely they were intended to support a dock. Around 1937, while a home was being constructed on what is now Kaseburg's land, the living room portion of a float house was towed from another location and was tied to one of the pilings. The pilings may originally have been intended to hold the portion of the float house in place. Later, they were used as a destination for swimmers. One of the pilings was also used to support a now-defunct water intake pipe. There is no evidence that the pilings were ever used to support a dock or to moor any craft capable of traveling under its own power, with the exception of a single piling that the Trulocks use to anchor one of their marina's docks.

In the early 1950s, the United States Army Corps of Engineers constructed the Albeni Falls dam on Lake Pend Oreille, thereby creating an artificial high water mark ("AHWM")[2] approximately eleven and a half feet above the natural high water mark.

In 1974, Douglas McLean, the owner of what is now both Kaseburg and Congleton's respective properties, submitted a notice of existing encroachments (the "Notice").[3] On a hand-drawn schematic of the area, McLean noted the existence of a small dock, which he kept beached at the high water mark; a juniper tree, which was "used to moor small boats"; and the aforementioned L-shaped series of pilings. In the margin, not next to any particular structure on the drawing, McLean wrote, "Purpose: Private swimming & boat moorage area; & private water source." He did not specify which purpose related to which structure. A neighbor who knew McLean stated that McLean submitted the Notice in order to be able to continue to use the pilings to support his water intake pipe. There is no evidence that McLean intended the phrase "boat moorage area" to apply to the pilings, rather than the dock and tree.

---

[2] *See* I.C. § 58-1302(d).

[3] The filing of such a notice was allowed by the former I.C. § 58-153, which was renumbered I.C. § 58-1312 by 1990 Idaho Sess. Laws 986. At the time McLean filed his Notice, the statute provided:

> On or before December 31, 1974, every person owning or possessing an existing navigational or nonnavigational encroachment on, in or above the beds or waters of a navigable lake in this state shall file with the board notification thereof. Such notice shall be upon forms to be furnished by the board and contain such information concerning the encroachment as would be necessary on plans submitted with an original application under the provisions of this act.

It is undisputed that the pilings currently serve little or no useful purpose. Indeed, it is undisputed that the pilings are a navigational hazard because they increase crowding on the Bay; are nearly completely submerged when the water level is high; and are difficult to see, especially at night. The Trulocks anchor one of their marina's docks with one of the pilings, but they could adequately anchor the dock without using the piling. Additionally, neighbors have installed lights on one or more of the pilings, but did so only to warn boaters of the pilings' presence.

In August of 2008, Kaseburg submitted a "Request for Assignment of Encroachment Permit" on behalf of "Douglas C. McLean (Deceased)." McLean was Kaseburg's predecessor in interest; however, he was also Congleton's predecessor in interest, and the pilings are adjacent to Congleton's land, not Kaseburg's. Nonetheless, the IDL granted the request and transferred McLean's permit to Kaseburg. It does not appear that the IDL made any determination of Congleton and Kaseburg's littoral boundaries, or that Congleton was ever notified of the permit transfer.[4]

Later in 2008, Kaseburg communicated with the IDL via email. The IDL informed him that the wooden pilings were "not something we would normally permit anymore" and that, unless used to "hold a floating dock in location," any new pilings "would be considered a non-navigational encroachment and would have to provide a benefit to the public to be permitted." In February of 2009, Kaseburg stated his desire to install a dock with an area of between 1,590 and 2,120 square feet. The IDL responded that it did not permit single-family docks exceeding 700 square feet, except for properties accessible only by boat.[5]

In March of 2009, Kaseburg filed an application with the IDL ("Application 219-B") requesting permission to remove all of the pilings and to replace ten of them with steel pilings. Kaseburg's application did not explain why he wanted to install the pilings or mention any additional structures that he wanted to attach to them. He instead characterized his proposed activity as a "maintenance operation." The IDL processed Kaseburg's application as a request to replace a nonnavigational encroachment.

---

[4] At least some of the pilings may be within Congleton's littoral lines. Generally, a littoral line begins at the boundary between two lakefront owners' properties and extends into the lake perpendicular to the shore. Littoral lines may be convergent or divergent if the shoreline is concave or convex, respectively. *Brett v. Eleventh St. Dockowner's Ass'n*, 141 Idaho 517, 522, 112 P.3d 805, 810 (2005) (quoting *Driesbach v. Lynch*, 71 Idaho 501, 508–09, 234 P.2d 446, 450–51 (1951)).

[5] *See* I.D.A.P.A. 20.03.04.015.01(b).

At this point, it is useful to note the statutory definitions of "navigational" and "nonnavigational" encroachments. Pursuant to the Lake Protection Act:[6]

> "Encroachments in aid of navigation" means and includes docks, piers, floats, pilings, breakwaters, boat ramps, channels or basins, and other such aids to the navigability of the lake, on, in or above the beds or waters of a navigable lake. The term "encroachments in aid of navigation" may be used interchangeably herein with the term "navigational encroachments."

> "Encroachments not in aid of navigation" means and includes all other encroachments on, in or above the beds or waters of a navigable lake, including landfills or other structures not constructed primarily for use in aid of the navigability of the lake. The term "encroachments not in aid of navigation" may be used interchangeably herein with the term "nonnavigational encroachments."

I.C. § 58-1302(h)–(i). The distinction between navigational and nonnavigational encroachments, as well as the distinction between encroachments inside and outside of the line of navigability, significantly impact how permit applications are processed. I.C. § 58-1305(a) states:

> Applications for construction or enlargement of navigational encroachments not extending beyond the line of navigability nor intended primarily for commercial or community use shall be processed by the board with a minimum of procedural requirements and shall not be denied nor appearance required except in the most unusual of circumstances or if the proposed encroachment infringes upon or it appears it may infringe upon the riparian or littoral rights of an adjacent property owner.

Similarly I.D.A.P.A. 20.03.04.025.01 states:

> Applications for single-family and two-family navigational encroachments not extending beyond the line of navigability will be processed with a minimum of procedural requirements and shall not be denied except in the most unusual of circumstances. No newspaper publication, formal appearance by the applicant, or hearing is contemplated.

In contrast, I.D.A.P.A. 20.03.04.030.02 provides:

> Encroachments not in aid of navigation in navigable lakes will normally not be approved by the Department and will be considered only in cases involving major environmental, economic, or social benefits to the general public. Approval under these circumstances is authorized only when consistent with the public trust doctrine and when there is no other feasible alternative with less impact on public trust values.

---

[6] I.C. §§ 58-1301 to -1312.

Later in March of 2009, the IDL mailed a notice of Application 219-B to several potentially interested governmental agencies and to Kaseburg's adjacent neighbors. The Bonner County Sheriff (the "Sheriff"), the Idaho Department of Fish and Game ("Fish and Game"), and several individuals filed objections. The Sheriff supported removing the existing pilings, which he characterized as "a hazard to navigation." However, he was of the opinion that the proposed steel pilings would also be a hazard and therefore opposed the application. Finally, the Sheriff noted that Kaseburg had not disclosed his purpose for wishing to replace ten of the wood pilings with steel pilings. Fish and Game noted that the pilings were "in an advanced stage of decay and should be removed." Fish and Game also noted that Kaseburg had not stated what he intended to do with the steel pilings.

The individual objectors were similarly concerned that Kaseburg had not explained why he wanted to install the steel pilings; they believed that he might follow up Application 219-B with a request to add a sizeable dock and a breakwater. They observed that steel pilings would continue to pose a navigation hazard. If any dock were later built on the proposed steel pilings, it would extend a significant distance into the Bay and therefore would increase silt deposition and milfoil growth in the Bay. The neighbors also objected to the potential interference with their views of the Bay.

In May of 2009, after the objector's comments had already been submitted, Kaseburg attempted to modify his application. He wished to add a 1,640-square-foot dock that was not included in his initial application. The IDL refused to consider the proposed modification. On June 9, 2009, the IDL denied Kaseburg's permit application on the grounds that the replacement of the wooden pilings would serve no beneficial public purpose, and, in fact, would perpetuate a hazard to navigation. Later in the month, Kaseburg requested a reconsideration hearing, which the IDL granted. At the hearing, Kaseburg stated that he intended to use the steel pilings to moor his fifteen-foot wooden sailboat, and possibly his father's forty-two-foot wooden sailboat.

In August of 2009, while a final decision on Application 219-B was pending, Kaseburg submitted a new application ("Application 219-C"). He wished to install a 700-square-foot movable dock system anchored to one of the pilings and, separately, a mooring buoy. The piling serving as an anchor would be cut off three feet above the mud line. Kaseburg explained that his family uses wooden boats, which must remain in the water year-round to prevent their hulls from drying out. He also stated that he did not wish to rely on the Trulocks' marina across the Bay,

because there might not be any boat slips available for a thirty-foot sailboat without auxiliary power. He further stated that, if the marina's ownership changed in the future, he might not have an adequate place to moor his boat or boats. He objected to using the northeast side of his property to access the lake because a dock located there would be "smack dab in the middle of the navigational channel" and would be too exposed to bad weather.

The IDL processed Application 219-C as a request for a permit for a navigational encroachment extending beyond the line of navigability. Idaho Code section 58-1302(g) defines "line of navigability" as:

> [A] line located at such distance waterward of the low water mark established by the length of existing legally permitted encroachments, water depths waterward of the low water mark, and by other relevant criteria determined by the board when a line has not already been established for the body of water in question.

*See also* I.D.A.P.A. 20.03.04.010.20 (adopting statutory language verbatim). As noted earlier, the determination of whether an encroachment extends beyond the line of navigability is crucial: only those encroachments that do not extend beyond the line of navigability are entitled to expedited processing and a presumption in favor of approval under I.C. § 58-1305(a) and I.D.A.P.A. 20.03.04.025.01.

The IDL explained that it considered the line of navigability to be fifty-five feet waterward of the AHWM. The IDL therefore returned Kaseburg's second application for lack of the proper processing fee of $1,075. Instead, Kaseburg had paid only the $250 processing fee for navigational encroachments within the line of navigability. Kaseburg subsequently paid the higher fee under protest.

In October of 2009, the IDL mailed a notice Application 219-C to various governmental agencies and Kaseburg's adjacent neighbors. Again, there were many objections. Fish and Game observed that there appeared to be an inconsistency between Kaseburg's two applications. The first requested the removal of the existing wooden pilings because they were decaying. The second, however, relied on one of those same pilings as a structural component of the movable dock system. Fish and Game also stated that, in its opinion, the proposed encroachment would fall beyond the line of navigability. Finally, the three-foot piling stub and underwater cables "would pose an unseen hazard to boaters, anglers, and other recreationalists."

Kaseburg's neighbors objected on the grounds that the dock would lead to increased congestion in the Bay and would disrupt views across the Bay. One of the objecting neighbors

noted that, with the buoy anchored 190 feet into the Bay and attached to a 30-foot tether holding a 30-foot sailboat, Kaseburg's proposed encroachment could extend up to 250 feet into the Bay. Furthermore, the neighbors noted that, if Kaseburg's application were granted, it would encourage other littoral owners to demand permission to construct similar encroachments, thus leading to even greater congestion on the Bay. Because Kaseburg uses his lake house as a vacation home, one objector worried that no one might be around to move the dock as the water level in the lake changed. Yet another neighbor opined that the water on the northern end of Kaseburg's property, outside of the Bay, would be a more appropriate location for a mooring buoy. He pointed out that the water became deeper much more rapidly in that area, that there was no navigation lane there, and that any congestion would be much greater in the Bay than in the water to the north.

In January of 2010, the IDL hearing coordinator issued a memorandum recommending the affirmation of the earlier denial of Application 219-B. The hearing coordinator noted that there was no evidence that the pilings had ever been used for navigational purposes. The hearing coordinator further noted that the application did not specify any navigational use for the proposed replacement pilings. Although Kaseburg had later attempted to amend Application 219-B, this was done after notice had already been circulated and public comments responding to the initial version of the application had already been received; therefore, Kaseburg should have filed a new application rather than attempting to modify his existing application. The Director of the IDL then issued a Final Order adopting the recommendations in the hearing coordinator's memorandum.

Also during January of 2010, the IDL denied Application 219-C, noting that "the line of navigability for single family docks in this area has been established at fifty five feet (55') waterward of the AHWM." Because the proposed dock would extend between 95 and 300 feet waterward of the AHWM, depending on the time of year and corresponding lake level, the IDL believed that it properly processed Kaseburg's application as a request for a permit for a navigational encroachment extending beyond the line of navigability. The IDL held that the proposed encroachment provided no public benefit and therefore denied it. The IDL subsequently denied Kaseburg's request for reconsideration, stating that no reconsideration was necessary under I.C. § 58-1306(d) because there were objections to the application. The IDL stated that reconsideration of Application 219-B had been granted erroneously.

In February of 2010, Kaseburg filed a petition for judicial review with the First District Court for Bonner County in which he alleged that the IDL improperly denied his applications. The district court ruled in favor of Kaseburg and set aside both denials. The court reasoned that I.C. § 58-1302(h) defines "pilings" as navigational encroachments as a matter of law. It found the statutory definition unambiguous and therefore held that the IDL lacked the power to find any particular piling nonnavigational under any factual circumstances. The court further reasoned that, once a navigational encroachment is installed, it can never become nonnavigational by mere nonuse. It remanded the matter to the IDL "to determine the line of navigability and to consider [Kaseburg's] littoral rights in conjunction with the legislature's definition that the pilings at issue are 'encroachments in aid of navigation.' "

The district court initially awarded Kaseburg attorney's fees pursuant to I.C. § 12-117. After Kaseburg submitted his Memorandum of Costs and Attorney Fees, the IDL filed its Objection to Memorandum of Costs. Citing *Smith v. Washington Cnty.*, 150 Idaho 388, 391, 247 P.3d 615, 618 (2010) and *Laughy v. Dep't of Transp.*, 149 Idaho 867, 877, 243 P.3d 1055, 1065 (2010), the IDL argued that I.C. § 12-117 did not allow a court to award attorney's fees in a judicial review proceeding. The district court agreed and vacated its earlier award of attorney's fees. The IDL timely appealed the district court's order setting aside the IDL's denial of Applications 219-B and -C.

### III. ISSUES ON APPEAL

A.     Did the district court properly set aside the IDL's denial of Application 219-B?

B.     Did the district court properly set aside the IDL's denial of Application 219-C?

C.     Is Kaseburg entitled to attorney's fees?

### IV. STANDARD OF REVIEW

The applicable standard of review is well established:

> In an appeal from the decision of a district court acting in its appellate capacity under the IDAPA, this Court reviews the agency record independently of the district court's decision. This Court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." I.C. § 67–5279(1). This Court instead defers to the agency's findings of fact unless they are clearly erroneous. In other words, the agency's factual determinations are binding on the reviewing court, even where there is conflicting evidence before the agency, so long as the determinations are supported by substantial competent evidence in the record.

9

*A & B Irrigation Dist. v. Idaho Dep't Of Water Res.*, 153 Idaho 500, 505–06, 284 P.3d 225, 230– 31 (2012) (case citations and quotation marks omitted). An agency's final order must be affirmed unless the appellant shows that its substantial rights have been prejudiced, I.C. § 67- 5279(4); *Hawkins v. Bonneville Cnty. Bd. of Comm'rs*, 151 Idaho 228, 232, 254 P.3d 1224, 1228 (2011), and also that the final order is:

> (a) in violation of constitutional or statutory provisions;
> (b) in excess of the statutory authority of the agency;
> (c) made upon unlawful procedure;
> (d) not supported by substantial evidence on the record as a whole; or
> (e) arbitrary, capricious, or an abuse of discretion

I.C. § 67-5279(3); *Wheeler v. Idaho Dep't of Health & Welfare*, 147 Idaho 257, 260, 207 P.3d 988, 991 (2009). "On an appeal from the district court, we review the decision of the district court to determine whether it correctly decided the issues presented to it." *Elias-Cruz v. Idaho Dept. of Transp.*, 153 Idaho 200, 202, 280 P.3d 703, 705 (2012).

> An agency's interpretation of a statute that it is entrusted with administering is entitled to deference so long as it is reasonable and not contrary to the express language of the statute. We interpret the words of a statute according to their plain, usual, and ordinary meaning, and do not use any other tools of construction if the meaning of the statute is unambiguous from its words alone.

*Two Jinn, Inc. v. Idaho Dep't of Ins.*, ___ Idaho ___, ___, 293 P.3d 150, 152 (2013) (citations and quotation marks omitted).

Nonetheless, the courts have the ultimate authority to construe statutory language. *Kuna Boxing Club, Inc. v. Idaho Lottery Comm'n*, 149 Idaho 94, 97, 233 P.3d 25, 28 (2009). "When interpreting a statute, the primary function of the Court is to determine and give effect to the legislative intent." *Idaho Cardiology Assocs., P.A. v. Idaho Physicians Network, Inc.*, 141 Idaho 223, 227, 108 P.3d 370, 374 (2005) (quoting *Dyet v. McKinley*, 139 Idaho 526, 528, 81 P.3d 1236, 1238 (2003), *abrogated on other grounds by Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 265 P.3d 502 (2011)). "If a statute is ambiguous, this Court attempts to ascertain the Legislature's intent by examining the 'language used, the reasonableness of proposed interpretations, and the policy behind the statute.' " *Ward v. Portneuf Med. Ctr., Inc.*, 150 Idaho 501, 504, 248 P.3d 1236, 1239 (2011) (quoting *Magic Valley Newspapers, Inc. v. Magic Valley Reg'l Med. Ctr.*, 138 Idaho 143, 144, 59 P.3d 314, 315 (2002)). The various sections of a statute must be construed as a harmonious whole. *See City of Pocatello v. State*, 152 Idaho 830, 838,

275 P.3d 845, 853 (2012); *State v. Doe*, 147 Idaho 326, 328, 208 P.3d 730, 732 (2009); *Olson v. Ada Cnty.*, 105 Idaho 18, 20, 665 P.2d 717, 719 (1983).

## V. ANALYSIS

This case revolves around the question of whether Kaseburg was accorded fair treatment as guaranteed by the Idaho Administrative Procedure Act.[7] We hold that the district court erred by setting aside the IDL's denial of Application 219-B. The district court should have deferred to the IDL's determination that pilings are not per se navigational. Moreover, there was ample evidence supporting the IDL's conclusion that the encroachment proposed in Application 219-B was nonnavigational and would provide no public benefit. However, we also hold that the district court properly set aside the IDL's denial of Application 219-C, although not for the reasons that the district court relied on. The IDL assumed, without any basis in fact or law, that the line of navigability in the area of the proposed encroachment was fifty-five feet waterward of the AHWM. It cannot be determined whether the IDL applied the correct standard when processing Application 219-C until a proper line of navigability is established. Finally, Kaseburg is not entitled to attorney's fees, because he is not a prevailing party.

## A. The district court erred in setting aside the IDL's rejection of Application 219-B.

The district court held that all pilings placed into a lakebed are navigational as a matter of law, reversing the IDL's holding that whether a piling is navigational is a factual question. As noted above, we defer to an agency's statutory interpretation only if two elements are satisfied. The first element is met here because the IDL is entrusted with administering the Lake Protection Act. The IDL is an "instrumentality" of the State Board of Land Commissioners. Idaho Const. art. IX, § 7; I.C. § 58-101; I.C. § 58-119. The State Board of Land Commissioners has the power to "regulate and control the use or disposition of lands in the beds of navigable lakes, rivers and streams, to the natural or ordinary high water mark thereof, so as to provide for their commercial, navigational, recreational or other public use . . . ." I.C. § 58-104(9). Therefore, the duty of administering the Lake Protection Act falls upon the IDL. *See Brett v. Eleventh St. Dockowner's Ass'n*, 141 Idaho 517, 523, 112 P.3d 805, 811 (2005); *Lovitt v. Robideaux*, 139 Idaho 322, 326–27, 78 P.3d 389, 393–94 (2003).

The second element is also met because the IDL's interpretation—that the inclusion of the word "pilings" is illustrative rather than definitional—is reasonable and not contrary to the

---

[7] I.C. §§ 67-5201 to -5292.

11

express language of the statute. The phrase "and other such aids to the navigability of the lake" interjects ambiguity into the statute. I.C. § 58-1302(h). It is unclear whether this phrase was meant only to expand the class of encroachments that are navigational beyond those types of structures explicitly listed, or whether the phrase excludes particular structures that are not in fact aids to navigation. Moreover, we must construe the definitions of navigational and nonnavigational encroachments harmoniously. Together, the two definitions establish a dichotomy: an encroachment is either navigational or nonnavigational. The district court's interpretation would have the impossible consequence of making certain encroachments (such as the pilings at issue here) both navigational as a matter of law and also nonnavigational as a result of being constructed not primarily for use in aid of navigation.

Because the statute is ambiguous, we must consider the Legislature's likely intent. It is highly unlikely that the Legislature intended to define pilings used to support bridges, helipads, and goose nesting boxes as per se navigational. Similarly, the Legislature almost certainly did not intend steel pilings driven into a lakebed to be considered "navigational" when such pilings have no specified use relating to navigation and are replacements for wooden pilings that also never had any navigational use.

The IDL correctly notes that there is no evidence in the record that the series of wooden pilings has ever served as an aid to navigation;[8] in fact, all of the evidence shows that this encroachment is a hazard to navigation. Kaseburg argues that the pilings are navigational because they were used to "dock a house boat." This assertion is contrary to the evidence in the record. As described above, the pilings were once used to moor the living room portion of a float home after it was partially disassembled. Kaseburg does not contest the IDL's classification of float homes as nonnavigational encroachments. I.D.A.P.A. 20.03.17.010.10. Kaseburg further argues that, because McLean's Notice includes the words "boat moorage area," the pilings were navigational. However, the Notice also included a small dock and a juniper tree that was "used to moor small boats." It is more likely that these structures constituted the "boat moorage area."

There was ample evidence in the record to support the IDL's factual finding that the existing wooden pilings were nonnavigational. Furthermore, Kaseburg's first application did not

---

[8] Although one of the pilings serves as an anchor for one of the Trulocks' docks, Kaseburg's proposed modification was unrelated to this navigational purpose. Also, this incidental use could not transform all of the pilings into navigational encroachments.

specify any navigational purpose for the steel pilings. There was also ample evidence that the replacement pilings would serve no public purpose and, in fact, would perpetuate a hazard to navigation. Therefore, the IDL properly denied Application 219-B.

**B.      The district court properly set aside the IDL's rejection of Application 219-C, although the district court's reasoning was incorrect.**

As noted above, I.C. § 58-1302(g) defines "line of navigability" as:

[A] line located at such distance waterward of the <u>low water mark</u> established by the length of existing legally permitted encroachments, water depths waterward of the low water mark, and by other relevant criteria determined by the board when a line has not already been established for the body of water in question.

(emphasis added). *See also* I.D.A.P.A. 20.03.04.010.20 (adopting statutory language verbatim). The IDL's conclusion that the line of navigability lies fifty-five feet waterward of the <u>AHWM</u> is contrary to the plain language of the statute and the IDL's own regulations. The line of navigability must be measured from the low water mark. It is not measured from the AHWM. The error is particularly egregious in this case because the low water mark is approximately 105 feet waterward of the AHWM. In other words, the IDL believes that the line of navigability is approximately fifty feet *landward*, rather than *waterward*, of the low water mark.

Moreover, the IDL's interpretation that the line of navigability lies fifty-five feet waterward of the AHWM is not based on substantial evidence. The record shows only that littoral owners on the Bay *believed* that "IDL guidelines" require docks to extend "no more than 55 feet out from summer pool," and that Bringhurst had previously constructed a dock in accordance with that belief. And, although the IDL's letter to Kaseburg denying Application 219-C states that "all other single family docks for miles up and down the shoreline are typically no more than fifty five feet (55') into the lake," there is no evidence in the agency record supporting this conclusion. At oral argument, counsel for the IDL was unable to specify when, or by whom, the line of navigability was established.

The IDL's improper determination of the line of navigability was in violation of a statutory provision and was not supported by substantial evidence. It also prejudiced Kaseburg's substantial rights by depriving him of a more lenient standard for the consideration of Application 219-C to which he may be entitled if it is later determined that his proposed encroachment actually falls within the line of navigability. Therefore, the IDL's denial of Application 219-C was properly set aside.

13

Nonetheless, it is important to emphasize the narrow scope of our holding. On remand, the IDL should create a record of specific facts that establish the line of navigability, which must lie waterward of the low water mark. Once it determines whether the encroachment in Application 219-C will extend beyond the correct line of navigability, the IDL should process the application under whichever standard is appropriate in light of that determination.

## C.     Kaseburg is not entitled to attorney's fees.

The IDL has not requested attorney's fees in this lawsuit. However, Kaseburg requests attorney's fees pursuant to I.C. § 12-117 for all stages of this litigation. Because Kaseburg is not a prevailing party with respect to Application 219-B, he is not entitled to attorney's fees related to that application. *See Bldg. Contractors Ass'n of Sw. Idaho v. Idaho Pub. Utilities Comm'n*, 151 Idaho 10, 18, 253 P.3d 684, 692 (2011). Nor is Kaseburg a "prevailing party" with respect to Application 219-C. A party has not "prevailed" until he receives "at least some relief on the merits of his claim." *Hewitt v. Helms*, 482 U.S. 755, 760 (1987). An order remanding a case to an administrative agency for further consideration normally does not qualify as relief on the merits. *See Envtl. Def. Fund, Inc. v. Reilly*, 1 F.3d 1254, 1257 (D.C. Cir. 1993). Here, it would be premature to declare Kaseburg a "prevailing party" because it is not yet known where the line of navigability is located; whether his proposed movable dock and mooring buoy lie beyond that line; and, regardless of that determination, whether his application ultimately should be granted. *See Terra-West, Inc. v. Idaho Mut. Trust, LLC*, 150 Idaho 393, 401, 247 P.3d 620, 628 (2010). We express no opinion on whether Kaseburg might obtain attorney's fees in the event that he eventually becomes a prevailing party.

## VI. CONCLUSION

The IDL properly classified the encroachment proposed in Application 219-B as nonnavigational. The district court erred by not according the IDL's interpretation of I.C. § 58-1302(h)–(i) sufficient deference. The inclusion of the word "pilings" in the definition of navigational encroachments was merely illustrative. Adopting the opposite construction—that all pilings are per se navigational—would conflict with the statutory definition of nonnavigational encroachments and also would subvert the Legislature's obvious intent.

Moreover, the IDL properly denied Application 219-B. In this application, Kaseburg merely sought to replace a series of decaying wooden pilings, which had never been used for any navigational purpose, with a smaller number of steel pilings, which also had no stated

navigational purpose. Kaseburg initially characterized this as a simple "maintenance" or "replacement" operation. After the IDL published notice of Kaseburg's application and received public comments, Kaseburg improperly attempted to amend the application to add a dock in order to convert his proposed encroachment from nonnavigational to navigational. There was ample evidence in the record before the IDL that, rather than providing any public benefit, the proposed steel pilings would perpetuate a hazard to navigation.

However, the IDL improperly processed Application 219-C as a navigational encroachment extending beyond the line of navigability without having first made a determination of the line of navigability that comported with the statutory definition and that was based on substantial evidence. On remand, the IDL must make a finding, based on substantial evidence, establishing the line of navigability. Then, the IDL must process Application 219-C in accordance with that finding. Because Kaseburg may yet prevail in his efforts to obtain a permit, we decline to award the IDL costs with respect to Application 219-C.

Chief Justice BURDICK, Justices EISMANN and HORTON, CONCUR.

JONES, J., specially concurring.

I concur in the Court's opinion but wish to further address the line of navigability issue in Part V.B. As the Court notes, the record contained scant evidence to support IDL's assertion that the line of navigability had been "established at fifty five feet (55') waterward of the AHWM." The record did not contain evidence as to when the line of navigability had been established or the legal authority pursuant to which it was established. On remand, IDL should take the opportunity to provide that information.

However, I would not limit IDL's options by allowing it to only establish a line of navigability line waterward of the low water mark. Idaho Code § 58-1302(g) establishes the line of navigability waterward of the low water mark "when a line has not already been established for the body of water in question." IDL should have the option of trying to show that the line of navigability was established for Glengary Bay prior to enactment of the Lake Protection Act, and that, when established, the line was landward of the low water mark.

Furthermore, the record contains evidence that a line of navigability as contended for by Kaseburg may be impractical and potentially hazardous in the narrow confines of Glengary Bay. According to one comment from a private party, "95 feet of dock jutting out into the bay is a hazard to navigation." The commenter continues, "[t]here is no benefit to the general public if

15

the application is approved. . . .[the Kaseburgs] gain at the expense of everyone else." IDL also contends that the dock proposed by Kaseburg would constitute a navigation  hazard and would be impractical within the confines of Glengary Bay if other landowners were to assert similar rights. These are the types of concerns that can be considered by the State Board of Land Commissioners in carrying out its constitutional responsibility to properly administer the beds of navigable lakes below their natural high water marks under the public trust doctrine. *See Kootenai Environmental Alliance, Inc. v. Panhandle Yacht Club, Inc.*, 105 Idaho 622, 671 P.2d 1085 (1983). The record does not indicate whether IDL contends that it established the line of navigability operating under the constitutional authority of the State Board of Land Commissioners, derived from Art. IX, §§7−8 of the Idaho Constitution, rather than relying on the statute. Presumably, that issue can be fleshed out on remand.